THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT S. DOMINIQUE, Defendant-Appellant.

First District (1st Division)    No. 78-612

Opinion filed July 14, 1980.

Ralph Ruebner and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Iris E. Sholder, and Joel A. Eisen-Stein, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

After a jury trial in the circuit court of Cook County, defendant Robert S. Dominique was convicted of attempt murder, aggravated battery and attempt deviate sexual assualt. The trial court merged the aggravated battery conviction into the attempt murder conviction and imposed concurrent sentences of from 100 to 200 years for attempt murder and from 6 to 18 years for attempt deviate sexual assault. Defendant appeals, contending that (1) the instructions on attempt murder were improper, (2) the trial court erred in finding him competent to stand trial, (3) defendant's right to remain silent was violated by the State's comments to the jury on defendant's failure to assert his insanity defense at the time of his arrest or ask to see a doctor before his alleged escape attempt, (4) the State failed to prove defendant was sane beyond reasonable doubt, and (5) the trial judge at the sentencing hearing improperly considered testimony describing defendant's attacks upon three other victims.

Complainant Margaret Cassidy, who lived one block from the CTA

El tracks, testified that about 9:15 p.m. on November 13, 1975, she went out the back door of her apartment and was going down the alley behind her apartment a distance of about three-fourths of a block to visit a friend. The alley was very well lighted. Complainant was walking south down the alley when she passed a man coming out from a parking area underneath one of the buildings. Cassidy testified that she continued to walk down the alley and in a very short time she heard some footsteps behind her and a man's voice say, "Hey." She continued walking down the alley. The man said, "Hey, what's your name," and grabbed complainant's right upper arm. Complainant testified that she turned and looked in the face of defendant. She noticed that he had "wide and open wide" eyes. Cassidy thought that defendant had the features of a retarded person, but she did not think defendant was retarded.

Cassidy testified further that defendant told her he wanted her to perform oral sex with him. After she refused, defendant told her he was going to kill her. Complainant stepped backward and the defendant grabbed her. She screamed and defendant struck her with a knife on her left side. After she was hit the first time, she crouched over, making a semi-circle with her back, so that her back was to defendant. The defendant continued to stab her in the back, seven or eight times in all. After defendant stopped hitting her, complainant turned around and saw defendant run toward the area where the cars were parked and then run between two cars and between two buildings.

She got up and tried to run toward her friend's apartment, but realized she was bleeding and walked as fast as she could. When she arrived at her friend's apartment building, she entered the vestibule and rang the bell. An ambulance arrived at the apartment and took her to Edgewater Hospital. Her stay there lasted two weeks, one week in intensive care. She suffered five stab wounds and the collapse of both lungs.

She further testified that defendant had spoken coherently in a slow, moderate tone throughout the attack. She said she did not think defendant had been under the influence of alcohol or drugs. She believed defendant had been sane at the time, that he knew what he was doing and could have conformed his conduct to the requirements of the law.

Chicago Police Officer Robert Louis testified that at approximately 9:30 or 10 p.m. on November 13, 1975, he and James Morrison, another Chicago police officer, were both assigned to the mass transit unit and were working in civilian dress. They boarded a southbound Howard Street El train at Washington and State Streets. As the officers rode south on the train, two uniformed officers boarded at the Monroe Street stop and Officer Louis saw a man, later identified as defendant, put something under his coat. It was a can of beer, and when the uniformed officers left

and went into the next car, defendant proceeded to drink his beer. At the Jackson and State Street stop, Officers Louis and Morrison escorted defendant off the train. They told defendant it was against the law to be drinking on the train. Defendant replied that he knew that and apologized for it. Defendant was placed under arrest and then searched. Officer Morrison recovered a 6-inch hunting knife that was in a leather holder defendant had in the middle of his back in his belt. Defendant told the officers that he was a cook in a restaurant, that he used the knife at work, and that he carried it for protection since he had once been robbed on the El. Defendant was subsequently released on bond.

Officer Louis further testified that in his opinion, based upon the time he had spent with defendant that night, defendant was sane, could appreciate the criminality of his conduct and could conform his conduct to the requirements of the law.

Chicago Police Officers James Nolan, Paul Roppel and John DiMaggio were assigned to investigate the stabbing of Margaret Cassidy. Investigator Nolan testified that speaking with Officer Robert Louis on November 20, 1975, the investigators obtained eight photographs, including a photograph of defendant, and went to Edgewater Hospital. There, Cassidy viewed the photographs and made an identification, but had reservations since the man in the photograph had a moustache, but her attacker had had none.

Later that night, Investigators Nolan and Roppel and Sergeant DiMaggio went to a hotel at 12 West Van Buren Street, found defendant and subsequently placed him under arrest. At this time defendant was advised of his *Miranda* rights. Investigator Nolan further testified that defendant was taken to Area Six homicide headquarters. At that time defendant denied knowledge of or participation in the attack on Cassidy. On the morning of November 21, 1975, defendant was again advised of his *Miranda* rights. Defendant then stated that on November 13, 1975, he had demanded oral sex from a woman he had passed in an alley in the Loyola area and that when she refused he stabbed her. When an approaching car frightened him, he fled through a gangway. Defendant further stated that he boarded a southbound El train, got off at a station, bought two beers and reboarded a southbound El. At the Jackson Street station he was arrested, still carrying the knife he had used to attack the woman.

After this statement, defendant guided the police to the scene of the attack. He pointed out the underground parking area he had walked · through when he first saw the victim walking down the alley. He also pointed out the spot where he had stopped the girl and had the short conversation. Investigator Nolan further testified that defendant then directed their attention to the place where the girl fell after he had

stabbed her. Defendant pointed out the gangway where he had intended to take his victim in order to have oral sex performed.

The officers then took defendant back to the Area Six police station, where an Assistant State's Attorney took a written statement from defendant. Defendant told the Assistant State's Attorney substantially the same version of the attack that he had told the officers. In his statement, defendant added the fact that he put his hat in a garbage can and took his coat off and threw it over his arm so that he would not be recognized, since he believed the people in the car had gotten a good look at him. Defendant was then placed in a lineup with four other persons. Cassidy identified defendant as her attacker.

A microanalyst at the Chicago Crime Laboratory testified that Cassidy's blood was Type O, the same as the blood on the blade of the knife and the scabbard taken from defendant on the evening of November 13, 1975.

Edward Curtis, a lieutenant with the Cook County sheriff's police assigned to the Department of Corrections at the Cook County jail, testified that on May 5, 1976, he was in charge of the movement of prisoners from the courtrooms to the jail. At approximately 9 o'clock that morning, he had a conversation with Gene Brown regarding defendant, an inmate at the jail. After the conversation, Curtis asked the chief of security at the jail for permission to set up a surveillance situation on defendant. Curtis returned to the main boulevard in the basement of the jail complex and passed defendant dressed in a gray business suit and heading in the direction of the yard. The lieutenant went to the tunnel that led to the work release unit and to the loading dock of the central kitchen. The loading dock abutted Sacramento Avenue. Prisoners were not permitted in the tunnel unless they had special authorization. Defendant was not authorized to be in the area. A short time later, defendant was arrested while walking in the tunnel.

David C. Accardi, an investigator for the Cook County Department of Corrections, testified that on May 5, 1976, he investigated defendant's attempted escape from the county jail. He took a statement from defendant concerning the attempted escape. The investigator's further testimony concerning the substance of the statement was stricken on motion by the State.

Defendant testified that he had been born and raised in Long Island, New York. His father and mother had been divorced when he was one year old. His mother remarried when he was five, and defendant lived in a household with four half-brothers and a half-sister. Defendant testified that he had had a bad relationship with his mother, in that he reminded her of his real father. He stated he had completed the fifth grade, and that

he had been confined to Central Islip State Hospital, a mental hospital, between the ages of 12 and 20. Defendant further testified that while at the hospital he had been given Thorazine and placed in restraints because he was always getting in fights. He also stated that he was given marijuana and alcohol for homosexual acts. When he had been released from the hospital, he had lived with his mother and stepfather for a couple of months, but left because he could not get along and felt like a stranger. He said that he had gone to New York City and had lived there with a homosexual who had picked him up.

Defendant testified that he had attempted to escape from the Cook County jail because he was not feeling good, was having nightmares, was nervous, and wanted to see a psychiatrist. After his escape attempt, he was seen by Doctor Howell. Since that time, defendant had been given the tranquilizing drugs, Thorazine and Artane.

The defense called Investigator Paul J. Roppel. He testified that on November 20, 1975, he was in defendant's hotel room where he observed defendant wearing ladies' panties and a woman's nightgown. He further testified that while in the hotel room he observed photographs depicting men and women engaged in oral sex.

It was stipulated that defendant's intelligence quotient was 92.

Dr. Katz, a psychiatrist, testified for the defense. He had examined defendant for one hour 13 months after the offense. Dr. Katz testified that on the basis of his examination he had made a tentative diagnosis that defendant had a paranoid psychosis, and that subsequent documents, consisting of a summary of defendant's stay in the mental hospital, a report of a Dr. Mellinger finding defendant had a personality disorder, four police reports, defendant's written statement and a report of an EEG ordered by Dr. Katz and taken on defendant, only added to that diagnosis. The doctor also concluded that the hypothetical man represented by facts assumed in defendant's hypothetical question was suffering from a mental disease on November 13, 1975, and had lacked the substantial capacity to conform his conduct to the requirements of the law. Dr. Katz thought that defendant had sociopathic characteristics, would tend to lie and misrepresent the truth and, since defendant was facing a long prison term at the time of the interview, possibly exaggerated his unusual behavior.

In rebuttal, the prosecution called Dr. John R. Hughes. A neurologist, he was licensed to practice medicine and specialized in the interpretation of brain waves. Dr. Hughes had evaluated the EEG tracing taken on defendant. He stated that there was nothing abnormal in the EEG and that the tracing showed no evidence of any brain syndrome or damage or disease.

At defendant's sentencing hearing on March 31, 1977, the State

submitted three statements made by defendant regarding three other separate attacks on other women. The first statement related to an attack on November 6, 1975; the second, to an attack on November 8, 1975; and the third, to an attack on November 17, 1975. The court allowed each of these victims to testify at the sentencing hearing regarding the attack upon her and her subsequent identification of defendant as her assailant. Defendant's conviction for attempt burglary in 1973, for which he had been sentenced to serve a term of 1 to 3 years' imprisonment, was also submitted at the sentencing hearing. The court was advised that defendant had been paroled on October 17, 1975, and had been on parole at the time of the attack on Cassidy. The court then imposed concurrent sentences of from 100 to 200 years for attempt murder and from 6 to 18 years for attempt deviate sexual assault. After the court pronounced sentence, the court granted the State's motions to *nolle pros* the three pending indictments relating to the attacks made upon the three witnesses testifying at the sentencing hearing.

Defendant first contends that the instruction given the jury regarding attempt murder was erroneous under *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28, and *People v. Viser* (1975), 62 Ill. 2d 568, 343 N.E.2d 903. The State concedes that these instructions are improper. However, it contends that reversal is not mandated since defendant waived the issue by failing to properly preserve it in the trial court; the giving of the improper instruction was not plain error since the evidence adduced at trial overwhelmingly established that defendant possessed the specific intent to kill; and, even if the giving of the improper instruction was plain error, it was harmless beyond a reasonable doubt. Defendant argues that the error was plain error under Supreme Court Rule 451(c) (Ill. Rev. Stat. 1977, ch. 110A, par. 451(c)), and *was too substantial to be considered harmless.*

■■ Defendant neither objected to the instruction at trial nor raised the instruction as error in his particularized oral motion for a new trial. Consequently, he has waived consideration of the matter on appeal. (*People v. Daily* (1979), 79 Ill. App. 3d 928, 398 N.E.2d 923; *People v. Humes* (1979), 78 Ill. App. 3d 255, 397 N.E.2d 130; *People v. Stacker* (1979), 77 Ill. App. 3d 302, 395 N.E.2d 997; *People v. Siebert* (1979), 72 Ill. App. 3d 895, 390 N.E.2d 1322.) In *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331, where the defendant had failed to object to the erroneous attempt murder instruction in the trial court, the court held that the error was waived because the evidence was not closely balanced; but even if the giving of the instruction was plain error, it was harmless beyond a reasonable doubt.

In *People v. Jones* (1979), 81 Ill. 2d 1, 405 N.E.2d 343, the supreme court held that an improper attempt murder instruction will not justify a

reversal where the evidence is so clear and convincing that the jury could not reasonably have found the defendant not guilty. Any error in instructing the jury regarding the element of intent to kill was harmless beyond a reasonable doubt. Here, the evidence of intent to kill was clear and convincing. The evidence showed that after defendant's demand for oral sex and Cassidy's refusal, defendant told Cassidy that he would kill her. Defendant then stabbed the victim seven or eight times in her back with a six-inch hunting knife. The intent to kill was clear. The jury would have found defendant guilty of attempt murder even if they had been instructed only that defendant must have acted with specific intent to kill. (See *People v. Mosley* (1980), 85 Ill. App. 3d 870, 407 N.E.2d 640; *People v. Seats* (1979), 68 Ill. App. 3d 889, 386 N.E.2d 879; *People v. Lindsay* (1978), 67 Ill. App. 3d 638, 384 N.E.2d 793.) Therefore, the improper instruction given to the jury was not reversible error.

Defendant's second contention is that he was denied due process of law when the trial court denied his motion for a psychiatric examination and a fitness hearing. During the examination of potential jurors, the defense moved that defendant be examined and a hearing held to determine his fitness to stand trial. The court denied the motion, stating in part:

"* * * The Court has observed this defendant through these proceedings, has observed the defendant looking at the transcript of the proceedings, has observed the defendant looking at certain papers out there and reading and turning the pages, has observed him with counsel, has observed the defendant just a few days ago on his motion when he took the stand and the answers that he understood the questions, that he understood the answers. In fact, at one juncture when it was something that was adverse to his interest, he says, 'I take the 5th Amendment,' which shows the person to be very lucid and understanding the nature of the charge. He understands that he can cooperate with counsel. In fact, when the defendant walked into the courtroom this morning, he had a cigarette and he took the last puff and smoke was emanating from his mouth but he did not take the cigarette in the courtroom which means he understands where he is at and what is going on.

And based on all of the matters that the Court has observed and the matters presented, the Court feels that the defendant understands the nature of the charge, he is able to cooperate with counsel and this is a matter in behalf of the defendant to delay this matter before this Court and the motion is denied."

Before trial, the defense renewed its motion, which the court denied, stating in part:

"* * * [T]he court had observed the defendant in the courtroom, discussing things with his Counsel, calling attention to Counsel certain things that he felt were irregular which shows he understands where he was at in the proceedings and the nature of the charges and is able to cooperate with Counsel.

Therefore, your motion at this time is denied."

In his oral motions, defense counsel stated that he believed defendant was unfit and could not cooperate with him.

Defendant first argues that the trial court did not deny defense's motion for lack of bona fide doubt of defendant's fitness to stand trial, but instead denied the motion and found defendant fit to stand trial. Defendant contends that by ruling on the merits of defendant's fitness issue without first ordering an examination or holding a hearing, defendant's due process rights were violated.

In our view, the trial judge's comments and ruling indicate his belief that there existed no bona fide doubt of this defendant's fitness to stand trial.

We disagree with defendant's further contention that even if the trial court actually ruled that there was no bona fide doubt of defendant's fitness to stand trial, the ruling was error.

To require an accused to stand trial or be sentenced at a time when he is unfit to do so constitutes a denial of due process of law. (*Pate v. Robinson* (1966), 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836; *People v. Jackson* (1978), 57 Ill. App. 3d 809, 373 N.E.2d 583.) The statute in effect at the time of trial governing fitness to stand trial stated:

"(a) For the purposes of this Section a defendant is unfit to stand trial or be sentenced if, because of a mental or physical condition, he is unable:

(1) to understand the nature and purpose of the proceedings against him; or

(2) to assist in his defense.
                    * * *

(c) When a bona fide doubt of the defendant's fitness to stand trial or be sentenced is raised, the court shall order that a determination of that question be made before further proceedings." (Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—1.)

Although this statute has been repealed by Public Act 81-1217, the provisions replacing it (Ill. Rev. Stat., 1979 Supp., ch. 38, pars. 104—10, 104—11) make no substantive changes.

Because a trial judge has the opportunity to observe the defendant, the determination as to whether a bona fide doubt exists is to be made initially by the trial court (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677; *People v. Lewis* (1979), 75 Ill. App. 3d 560, 393 N.E.2d 1380),

to be upset only upon a showing of an abuse of discretion. (*People v. Lewis*.) Likewise, the granting of a psychiatric examination is within the discretion of the trial judge. (*People v. Jenkins* (1978), 67 Ill. App. 3d 565, 384 N.E.2d 1348.) The court must be presented with facts showing a bona fide doubt of defendant's fitness. The State bears the ultimate burden of establishing the defendant's fitness by a preponderance of the evidence. *People v. Bilyew* (1978), 73 Ill. 2d 294, 383 N.E.2d 212.

■ After reviewing the record, we find that the trial court did not abuse its discretion in refusing defense counsel's motions for a fitness hearing or failing to order a psychiatric examination of defendant. The facts presented to the trial court did not raise a bona fide doubt that defendant was unable to understand the nature and purpose of the proceedings or to assist in his defense. Defense counsel's statement that he believed defendant was unfit and could not cooperate with him is not sufficient to raise a bona fide doubt of defendant's fitness. As stated recently in *People v. Foster* (1979), 76 Ill. 2d 365, 381, 392 N.E.2d 6:

> "* * * [I]t is settled law in Illinois that counsel's mere assertion that he has reason to believe that the defendant may be unable to understand the charges or assist in his defense is not sufficient to create the 'bona fide doubt' of defendant's fitness which triggers the obligation to hold a fitness hearing * * *."

■ The fact that in May of 1976, nine months prior to trial, defendant was diagnosed a schizophrenic and paranoid psychotic, paranoid type, is also not sufficient to create a bona fide doubt of defendant's fitness, because even if such condition existed at the time of trial, a defendant can be fit to stand trial although his mind may be otherwise unsound. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677; *People v. Rockamann* (1979), 79 Ill. App. 3d 575, 399 N.E.2d 162.) In addition, because an accused may be tried where prescribed medication is used in order to maintain defendant's fitness (*People v. Davis* (1978), 65 Ill. App. 3d 580, 382 N.E.2d 594; *People v. DalFonso* (1974), 24 Ill. App. 3d 748, 321 N.E.2d 379), the fact that at the time of trial defendant had been taking medication to keep him in touch with reality does not raise a bona fide doubt of defendant's fitness.

■ The trial judge was in a superior position to observe defendant and to evaluate his behavior and ability to understand the proceedings and to cooperate with defense counsel. (*People v. Murphy*.) He properly took into account his personal observation of defendant in determining whether or not a bona fide doubt existed. (*People v. Morthole* (1977), 51 Ill. App. 3d 919, 366 N.E.2d 606.) As indicated by his comments denying defendant's motions, it is clear that defendant took an active role in assisting in his defense. (See *People v. Salvaggio* (1976), 38 Ill. App. 3d 482, 348 N.E.2d 243.) The trial judge also observed that defendant's

testimony in regard to certain pretrial motions indicated that defendant understood the nature of the charge and the questions asked. His answers were coherent and responsive. Indeed, at one point during defendant's testimony, he even invoked the fifth amendment privilege against self-incrimination when he thought the answer would be unfavorable to him. It is clear that defendant's active participation in the case and purposive testimony were inconsistent with his assertion of unfitness to stand trial. (See *People v. Murphy*; *People v. Jenkins* (1978), 67 Ill. App. 3d 565, 384 N.E.2d 1348.) The record demonstrates that defendant was able to understand the nature of the proceedings against him and was able to cooperate with defense counsel. The trial court did not abuse its discretion either in refusing the defense motions to order a fitness hearing or in failing to order a psychiatric examination.

Defendant's third contention is that the State violated defendant's right to remain silent by commenting during closing argument that defendant failed to assert his insanity defense at the time of his arrest or to ask to see a doctor before his alleged escape attempt. The State maintains that defendant did not invoke his right to remain silent at the time of his arrest; that the challenged comments were fair and reasonable inferences from the evidence; that the trial judge sustained objections to the challenged comments, curing any possible error; that defendant did not object to one comment, thus waiving any possible error as to that comment; that defense counsel's own closing argument invited one comment in rebuttal; and that none of the comments prejudiced defendant in light of the overwhelming evidence of defendant's guilt.

■ The State's argument that any error committed by making one of the allegedly improper comments was waived when defense counsel did not object at the time it was made is ill-founded because the doctrine of waiver is inapplicable where a *Doyle* violation is asserted. *People v. Upshire* (1978), 62 Ill. App. 3d 248, 379 N.E.2d 38.

In *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, the court held that if the arrested party has been warned of his right to remain silent, it is fundamentally unfair and a deprivation of due process to utilize the silence which follows and to impeach the accused's alibi subsequently offered at trial for the first time.

However, in *Anderson v. Charles* (June 16, 1980), 48 U.S.L.W. 3819, the court held that *Doyle* does not apply where a defendant voluntarily speaks after receiving *Miranda* warnings and there is no attempt to draw meaning from any silence, but rather only an attempt to elicit an explanation for a prior inconsistent statement.

■ Initially, upon arrest and after advisement of his rights, defendant denied knowledge of or participation in the attack. This alone would not indicate defendant's choice not to invoke his right to remain silent.

(*People v. Tate* (1978), 63 Ill. App. 3d 119, 379 N.E.2d 693.) Later, however, after defendant had been given the *Miranda* warnings a second time, defendant gave a statement to the police admitting his guilt. After giving the statement, defendant then directed the police to the scene of the attack, pointing out to the police officers where the various events had happened during the attack. Because defendant did not invoke his right to remain silent, the *Doyle* rule is inapplicable. *People v. Hinson* (1979), 70 Ill. App. 3d 880, 388 N.E.2d 899; *People v. Trumbull* (1978), 67 Ill. App. 3d 262, 384 N.E.2d 842; *People v. Henson* (1978), 58 Ill. App. 3d 42, 373 N.E.2d 852. See *Anderson v. Charles* (June 16, 1980), 48 U.S.L.W. 3819.

Even though no *Doyle* violation is present, we must consider whether or not the prosecutors' comments were legitimate inferences drawn from the facts in evidence.

Great latitude is allowed prosecution counsel in closing argument. Each case must be decided on its own facts. (*People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880.) Arguments and statements based upon the facts in evidence or upon legitimate inferences drawn therefrom are not outside the bounds of proper argument. *People v. Oliger* (1975), 32 Ill. App. 3d 889, 336 N.E.2d 769.

Defendant cites four comments as improper. In the first, after the prosecutor noted defendant's explanation of his attempted escape, he stated that defendant made no statement with regard to an insanity defense until after he was caught trying to escape from jail and that defendant did not ask to see a doctor until after his alleged escape attempt. An objection was interposed by defense counsel, and the trial judge instructed the jury not to consider the comment. Defendant's second comment involved the State's argument to the jury that defendant's psychosis could not be a condition that had existed for any length of time because in 1973 defendant did not assert the defense of insanity in a case charging him with attempt burglary. Defense counsel's objection was sustained. In the third comment, the prosecutor argued that the jury should not believe the insanity defense because it had not been raised at an earlier time. Defense counsel's objection was overruled. Lastly, defendant argues that it was improper for the prosecutor to comment that defendant did not assert the defense of insanity when the police arrested him for drinking on the El or when defendant was arrested in his hotel room and that defendant now was raising insanity as an excuse. No objection to this comment was made by defendant at trial.

■■ With regard to defendant's first and second comments, we find both were improper because they were not based upon facts in evidence or upon legitimate inferences drawn therefrom. However, since defense counsel interposed an objection to the first remark which the court sustained and followed with an instruction to the jury to disregard the

comment, any harm caused was thereby cured. (See *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.) In addition, the trial judge also sustained defense counsel's objection to the second comment; any harm was thereby remedied. *People v. Hampton* (1969), 44 Ill. 2d 41, 253 N.E.2d 385; see *People v. Carlson.*

Defendant's third comment was also improper for the same reason. Although the trial judge did not sustain defense counsel's objection or instruct the jury to disregard the remark, we do not believe the error necessitates reversal. Where, as here, the evidence is overwhelmingly in favor of defendant's guilt, the error will be considered harmless beyond a reasonable doubt. (*People v. Eagle* (1979), 76 Ill. App. 3d 427, 395 N.E.2d 155.) Also improper was the last comment. Defendant was not required to assert his insanity defense at the time of his arrest. Consequently, comment upon his failure to do so was improper. (See *People v. Patterson* (1976), 44 Ill. App. 3d 894, 358 N.E.2d 1164 (prosecutorial comment regarding defendant's failure to assert defense at preliminary hearing improper because defendant not required to assert a defense at hearing designed only to determine probable cause).) However, we believe this error to be harmless beyond a reasonable doubt.

In light of the overwhelming evidence of defendant's guilt, the challenged comments viewed independently or cumulatively did not constitute a material factor in the jury's determination of defendant's guilt and do not require reversal in this case.

Defendant's fourth contention is that the State failed to prove defendant sane beyond a reasonable doubt. Defendant argues that after defendant introduced evidence of defendant's insanity, the State's only evidence on the issue of defendant's sanity came from lay witnesses and this evidence was not sufficient to sustain its burden of proving defendant sane beyond a reasonable doubt. The State maintains that defendant did not introduce sufficient evidence to shift the burden of proof to the State. The State further maintains that, assuming *arguendo* the burden did shift, expert testimony on the issue of insanity was not required in order to sustain their burden of proof and that their burden of proving defendant sane beyond a reasonable doubt was met.

■ ■ The law presumes all individuals to be sane. Once a defendant presents sufficient evidence to raise a reasonable doubt as to his sanity at the time of the offense, the State must prove his sanity at that time beyond a reasonable doubt. (*People v. Redmond* (1974), 59 Ill. 2d 328, 320 N.E.2d 321.) Doctor Katz' testimony met defendant's burden of initially raising the issue of insanity, thus placing on the State the burden of proving defendant sane beyond a reasonable doubt. The issue of defendant's sanity at the time of the offense was a question of fact to be determined by the jury, and its finding of sanity will not be disturbed unless it is so

manifestly against the weight of the evidence as to indicate the verdict was based on passion or prejudice. (*People v. Ford* (1968), 39 Ill. 2d 318, 235 N.E.2d 576; *People v. Bloodworth* (1979), 68 Ill. App. 3d 341, 385 N.E.2d 904.) The State is not required to present expert medical testimony when confronted with the issue of insanity. (*People v. Bloodworth*; *People v. Deizman* (1976), 44 Ill. App. 3d 829, 358 N.E.2d 1208; *People v. Horton* (1975), 29 Ill. App. 3d 704, 331 N.E.2d 104.) In addition, a jury may properly conclude that defendant was sane by accepting lay testimony over expert testimony. (*People v. Bloodworth*; *People v. Spears* (1978), 63 Ill. App. 3d 510, 380 N.E.2d 423.) In the case at bar, there is ample evidence to support the jury's determination that defendant was sane at the time of the offense.

Defendant relied primarily on Dr. Katz in asserting his defense of insanity. Although Dr. Katz found defendant to be suffering from paranoid psychosis, the jury could properly have given little or no weight to his testimony in view of the fact that defendant was examined by the doctor 13 months after the offense for only one hour. In addition, Dr. Katz testified that he found defendant's EEG to be abnormal and that this evaluation confirmed his diagnosis. However, Dr. John R. Hughes, testifying for the prosecution in rebuttal, stated he also had evaluated defendant's EEG and had found nothing abnormal. The jury was free to accept Dr. Hughes' evaluation of defendant's EEG over Dr. Katz' evaluation. Furthermore, the victim, who had observed the defendant during the attack, and Officer Louis, who had observed defendant on the El train one-half hour after the offense, each testified that defendant could appreciate the criminality of his actions and could conform his conduct to the requirements of the law. The jury could properly choose to believe the prosecution's lay witnesses over the defense's expert.

Defendant argues that Cassidy's testimony that the attack had been unprovoked and that defendant's features gave him a retarded look tended to prove defendant's insanity. However, Cassidy had also testified that she did not think defendant was retarded and that she felt defendant knew what he was doing. Defendant also points to his own testimony that "something" made him go back after he first passed Cassidy in the alley as proof of his insanity at the time of the offense. The jury could have viewed this statement as self-serving and discounted its truthfulness. In addition, upon a review of defendant's actions after the attack, it is clear that the jury properly determined that defendant was sane beyond a reasonable doubt at the time of the offense. Defendant told police that he ceased stabbing the victim and fled after a car came up the alley because he felt that whoever was driving the car would see him. In defendant's written statement he said he put his hat in a garbage can and took off his coat and threw it over his arm so that he would not be recognized. These attempts to avoid identification tend to show defendant was sane at the

time of the offense. Furthermore, approximately one-half hour after the attack, defendant realized the criminality of drinking beer on the El train when he concealed the beer he was carrying from uniformed police officers. Upon his arrest for that offense, he told police he knew it was illegal to drink beer on the El train and apologized. After he was searched and the knife recovered, defendant told police he was a cook and carried the knife for protection. Defendant's actions following the attack indicate deliberate rational behavior. Defendant's lucidity was further exemplified by his detailed explanation of the incident to police.

■■ Based on the entire record, there is sufficient evidence to sustain a finding that defendant was sane beyond a reasonable doubt at the time of the offense.

Defendant's final contention is that he is entitled to be resentenced because evidence in the form of testimony by three witnesses that defendant had attacked them was improperly introduced at the hearing in aggravation and mitigation.

A court is not bound by the usual rules of evidence in determining sentence, but may search anywhere within reasonable bounds for facts which tend to aggravate or mitigate the offense. (*People v. Adkins* (1968), 41 Ill. 2d 297, 242 N.E.2d 258.) Inquiry into the general moral character of the offender, his mentality, his habits, his social environments, his abnormal or subnormal tendencies, his age, his natural inclination or aversion to commit crime and the stimuli which motivate his conduct, is proper. (*People v. Adkins.*) Testimony by witnesses with firsthand knowledge relating to other offenses or other charges pending against a defendant can properly be introduced and relied upon by the court when imposing sentence where the witnesses are subject to cross-examination. *People v. Stoutenborough* (1978), 64 Ill. App. 3d 489, 381 N.E.2d 415; *People v. Barksdale* (1976), 44 Ill. App. 3d 770, 358 N.E.2d 1150; *People v. Davis* (1976), 38 Ill. App. 3d 649, 348 N.E.2d 533; *People v. Lemke* (1975), 33 Ill. App. 3d 795, 338 N.E.2d 226; see *People v. Poll* (1980), 81 Ill. 2d 286, 408 N.E.2d 212.

In this case, the testimony of the other victims was relevant to defendant's general moral character, his natural inclination or aversion to commit crime and his abnormal or subnormal tendencies. We note that defendant had an opportunity to cross-examine all three victims and, in fact, did cross-examine two of the victims.

■■ We find that the testimony by the other victims relating to charges pending against defendant was properly introduced at the sentencing hearing and relied upon by the court when imposing sentence.

The convictions and sentences are affirmed.

Affirmed.

McGLOON and CAMPBELL, JJ., concur.