THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RONALD JACKSON, Defendant-Appellant.

First District (1st Division)    No. 79-803

*Opinion filed December 8, 1980.—Rehearing denied January 12, 1981.*

---

James J. Doherty, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Barry S. Pechter, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE CAMPBELL delivered the opinion of the court:

Defendant, Ronald Jackson, was indicted in Cook County for six counts of armed robbery and one count of attempt armed robbery. After a jury trial he was convicted of five counts of armed robbery and sentenced to 10 to 20 years in prison. Subsequent to his conviction, he was found unfit to stand trial on an unrelated pending murder charge. After this determination was made, the defendant filed a section 72 petition (Ill. Rev. Stat. 1977, ch. 110, par. 72) wherein he argued that his present state of unfitness raised the question of his fitness to be tried and sentenced in the earlier proceeding. The trial court denied his petition and it is from this denial that the present appeal was brought.

We affirm.

The parties have both presented very lengthy recitations of the facts which they deem pertinent to this appeal. For the sake of brevity, we will summarize those facts necessary to provide a background for this appeal and discuss other facts as they are pertinent to the arguments raised herein. The record reveals that prior to trial the defendant had dismissed one public defender and one private attorney, but was again represented by the public defender at his trial. The record further discloses that after answering ready for trial, the defendant obtained two continuances and

then requested a plea conference. Subsequent to this conference, the defendant sought a third continuance to again secure representation by private counsel. The public defender representing the defendant supported this motion on the basis that the continuance would provide time for him to investigate a possibly suggestive identification confrontation which had recently come to his attention. The court denied this motion. Thereafter, the defendant filed a motion to suppress the identification testimony and a hearing was held on this motion prior to the jury selection. This motion was also denied.

At the trial, five eyewitnesses testified for the State as to the circumstances surrounding the armed robbery. In the main they testified that they were at Bobo's Lounge located at 2858 West Van Buren in Chicago, on December 5, 1975, at approximately 2 p.m., when a stranger entered the lounge and after a short time announced a "stick-up." The man obtained money from each occupant of the lounge including the bartender at gun point. The gunman was present in the well-lit lounge for about 15 to 20 minutes during the robbery. The witnesses generally described the gunman as a black male in his mid 20's, wearing a black leather jacket and blue jeans with an estimated height of between 5'7" and 5'10". Weaver and Murrell separately identified the defendant as the gunman at a lineup conducted on the day after the robbery. Subsequently, Guider, Agee, and Pippins identified the defendant from a photograph of the lineup previously viewed by Weaver and Murrell. Additionally, each witness made an in-court identification of the defendant.

Three additional witnesses were presented. A police officer assigned to investigate the robbery testified that, incident to a communication from Murrell, he picked up the defendant on December 6, 1975, and arranged lineup and photographic identifications of the defendant by the witnesses. The testimony of a second police officer was objected to by the State. The defendant sought to use the officer to impeach State witnesses on the height of the robber. The trial court, after hearing the officer's proposed testimony *in camera*, sustained the State's objection on the basis that the testimony would not impeach the witnesses. Easter Jackson testified for the defense as an alibi witness. She testified that the defendant who was her nephew lived with her family and was with her the entire afternoon of the robbery.

. After the jury returned guilty verdicts on the five armed robbery counts, a presentence report was ordered. Prior to the sentencing hearing, the defendant filed a motion for a new trial alleging *inter alia* that the trial court had erred in denying the defendant's pretrial motion for a fitness examination and hearing. We note that no such pretrial motion has been found in the record. After the trial court denied this motion, the defense counsel moved for a fitness examination to determine the defendant's

fitness to be sentenced. The trial court denied the motion indicating it had no *bona fide* doubt of the defendant's fitness but agreed to order a fitness examination to aid the defendant in the preparation of his defense for an upcoming murder trial. After a hearing in aggravation and mitigation, the court sentenced the defendant to 10 to 20 years. The *mittimus* of his conviction was stayed pending the outcome of the fitness examination.

On February 3, 1978, the defendant filed a section 72 petition which sought a new trial or at least a new sentencing hearing on the basis of a psychiatrist's January 1978 finding that the defendant was unfit. The petition was later amended to include facts pertaining to the defendant's history of antisocial behavior, his attendance at elementary schools for retarded children, his arrest record, his prior commitment to the Dixon State School incident to a juvenile delinquency petition, medical reports and test results characterizing the defendant as mentally retarded.

Four medical witnesses testified at the hearing on the section 72 motion. Dr. Reifman, a psychiatrist and director of the Psychiatric Institute of the circuit court of Cook County (hereinafter Institute), testified that he examined the defendant on April 5, 1977, before his armed robbery trial and concluded that he was fit to stand trial. In reaching this conclusion, he consulted a report of a psychological examination given by Dr. Blumstein, an intelligence test, police reports, and a social history provided by the defendant's sister. The defendant received a 51 on the WAIS intelligence test which classified him as mentally retarded moderate. Reifman concluded from his examination that, despite the defendant's low intelligence, he could understand events and the charge and was able to cooperate with counsel. At the time Reifman conducted his fitness examination, he had no reports from the Illinois Department of Mental Health, and did not know of defendant's prior commitment to the Dixon State School. His conclusions, he noted, were consistent with both the Dixon and presentence investigation reports.

Reifman conducted a second examination of the defendant on January 17, 1978. This time, however, he reached the conclusion that the defendant was not fit because of the presence in the defendant of anxiety and emotional distress in addition to his mental retardation. These additional factors, which he termed negativism, resulted in a disruption of the defendant's thinking and concentration and prevented him from cooperating with counsel. Reifman defined retardation as the "performance in a subcultural manner because of the inability to use certain intellectual functions." Reifman stressed that retardation is not a mental disease. He concluded that the defendant's condition existed from birth and that defendant was simply one of a proportion of the population who is not as smart or as quick as others. Reifman also examined the defendant on November 14, 1978. At this time he was also unfit. This conclusion was

again based on the presence of the mental retardation in conjunction with negativism. At this time Dr. Reifman possessed various reports which indicated the possibility of organicity which is the loss of brain functioning due to brain damage, loss of brain tissue, or a chemical disturbance. The defendant was still suffering from negativism, which was signified by his refusal and inability to cooperate.

Reifman explained that the change between the April 1977 finding of fitness and the January and November, 1978, findings of unfitness was based on the addition of the element of negativism to the defendant's retarded conditions. It was Reifman's position that retardation alone did not render the defendant unfit and that if there had been no negativism in January and November, 1978, it is more than likely that he would have found the defendant fit. Reifman believed that the defendant's time in jail and his conviction as well as the upcoming murder trial were very influential in producing this change. He would give no opinion as to whether the defendant was unfit during the trial or at the time of the sentencing hearing nor could he estimate when the change in the defendant took place because he stated that fitness was a fluctuating condition.

Blumstein, a psychologist with the Institute, also examined the defendant in April 1977. From his examination he concluded that the defendant was uncertain of where he was and was unable to read or write, but knew who Blumstein was and knew that he was charged with armed robbery. As to the murder charge pending against him, defendant explained that some stud had shot himself. Dr. Blumstein concluded this indicated some understanding of the murder charge. The psychological tests which he performed suggested an organic brain problem and that the defendant was a high-grade mental defective. Dr. Blumstein stated that a person with a low intelligence quotient (hereinafter IQ) would be automatically disqualified for fitness. However, in April 1977, he gave his opinion that the defendant's fitness was quite questionable but possible in his report to Reifman. He based this opinion on his belief that the defendant's ability to cooperate was quite tenuous and that the defendant was not able to appreciate the seriousness of the charge.

Blumstein also saw the defendant on November 9, 1978, to determine his fitness then. At this time he knew defendant had been convicted of armed robbery. After this examination, Blumstein concluded that the defendant was not fit for trial. It was Blumstein's opinion that the defendant had not been fit in 1977 for the armed robbery trial. He viewed defendant's condition as static in nature with relatively minor fluctuations possible over time. He agreed with Dr. Reifman's diagnosis that defendant displayed negativism and found that defendant generally lacked the ability to comprehend and became confused under pressure. He explained that the difference in his findings was a matter of degree; the

defendant was the same person he was in April 1977; however, he was more confused. While Blumstein found the defendant borderline fit in April 1977; in November 1978 he found the defendant clearly unfit.

After the defendant's finding of unfitness in January 1978, he was committed to the Illinois Department of Mental Health and seen by the staff of the Illinois State Psychiatric Institute. Dr. Hartman, a psychiatrist there, first began her treatment of the defendant on February 23, 1978. At this time the defendant did not know the charges against him and thought he had been in custody approximately one month. The defendant was questioned as to the role of the judge, public defender, prosecutor, witnesses and jury in a criminal trial. He could not explain the jury's function nor what type of defense he would employ in the murder case. The results of psychological tests ordered by Dr. Hartman showed an IQ of 51 and pronounced perceptual motor integration deficit. Hartman concluded that the defendant was unfit, a conclusion concurred in by her staff. This conclusion was based on the defendant's uncertainty as to the charges, his illiteracy, and her diagnosis of his mental deficiency. The latter was weighted most strongly in her decision.

Hartman testified that the defendant may know the difference between a public defender and a private attorney, know of his choice to be present at his trial and generally know that the public defender was representing him. She also stated that defendant's behavior at trial could affect her decision as to his fitness. However, when given a hypothetical including facts pertaining to the defendant's trial behavior, Hartman found that they indicated a person fit for trial, but did not change her opinion that the defendant was not able to cooperate with counsel. She stated that the defendant's condition had existed for a long period of time including November 1977, and that under this state he would not be able to cooperate with counsel in March 1978 or in November or December, 1977.

The last witness, Joseph Szyszko, was the psychologist who performed the psychological evaluation for Dr. Hartman. His evaluation included performing an intelligence and perception motion functioning test. From these tests he concluded that defendant suffered from organicity and had an IQ of 51. The test he administered did not measure the defendant's understanding of the charges but only cooperation with counsel. Szyszko concluded defendant would have difficulty comprehending events at the trial. Furthermore, he believed the defendant's condition existed from 1970, while the defendant was at Dixon, to the present, and including November and December of 1977. While he did not assume everyone with organicity was unfit, he found the defendant unfit because of his retarded intelligence which would affect his understanding of the proceedings and his cooperation with counsel. He inter-

preted the defendant's acts at trial as possibly signalling understanding, however, he believed regardless of these acts that the defendant was unfit. He believed anyone with an IQ of 51, with qualification, would be unfit.

The trial court denied the section 72 petition on the basis that the medical testimony failed to raise a *bona fide* doubt of the defendant's fitness to be tried or sentenced. Specifically, the court rejected the medical testimony which equated retardation with unfitness. The court found the defendant's acts indicated his understanding of the charge against him and his cooperation with counsel.

■■ Initially, we note that the defendant's brief raises two evidentiary errors and a constitutional error pertaining to the original conviction which are alleged to constitute reversible error. While the State has responded to these arguments, the defendant has offered no authority for why these are proper matters for review. We note that the appendix to the defendant's brief and the record on appeal include a copy of two notices of appeal: one filed December 30, 1977, which constituted a timely filed notice from the defendant's December 14, 1977, conviction; and the other filed May 3, 1979, the day of the denial of the defendant's motion for section 72. It appears that after the first notice of appeal was filed no further action was taken until the present appeal at which time the defendant has chosen to argue issues raised during the trial as well as those germane to the section 72 petition. We believe that by the defendant's inaction for approximately 1½ years he has abandoned the appeal from the conviction. However, because of the seriousness of the constitutional issue that the defendant was denied due process of law, we will entertain that issue with our consideration of the issue raised by the denial of the defendant's section 72 petition.

The statute governing fitness to stand trial provides in pertinent part that:

> "(a) For the purposes of this Section a defendant is unfit to stand trial or be sentenced if, because of a mental or physical condition, he is unable:
>
>> (1) to understand the nature and purpose of the proceedings against him; or
>>
>> (2) to assist in his defense.
>
> * * *
>
> (c) When a bona fide doubt of the defendant's fitness to stand trial or be sentenced is raised, the court shall order that a determination of that question be made before further proceedings." Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—1.

It is well established in Illinois that the conviction or sentencing of a person who is unfit violates due process requirements. (*Drope v. Missouri*

(1975), 420 U.S. 162, 43 L. Ed. 2d 103, 95 S. Ct. 896; *Pate v. Robinson* (1966), 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836; *People v. Lang* (1979), 76 Ill. 2d 311, 391 N.E.2d 350, *cert. denied* (1979), 444 U.S. 954, 62 L. Ed. 2d 326, 100 S. Ct. 433; *People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677.) A trial court has the duty to require a fitness hearing where facts are brought to its attention either from its own observation or by suggestion of counsel that there is a *bona fide* doubt of defendant's fitness to stand trial. (*People v. Murphy*; *People v. Slaughter* (1970), 46 Ill. 2d 114, 262 N.E.2d 904; *People v. Harper* (1964), 31 Ill. 2d 51, 198 N.E.2d 825.) Whether a *bona fide* doubt of fitness exists rests within the discretion of the trial court. (*People v. Murphy*; *People v. Skorusa* (1973), 55 Ill. 2d 577, 304 N.E.2d 630; *People v. Franklin* (1971), 48 Ill. 2d 254, 269 N.E.2d 479.) A trial court's finding of fitness will not be reversed absent a clear abuse of discretion because it is recognized that the trial court is in the best position to observe the defendant and evaluate his conduct. *People v. Murphy*; *People v. Dudley* (1970), 46 Ill. 2d 305, 263 N.E.2d 1, *cert. denied* (1971), 402 U.S. 910, 28 L. Ed. 2d 651, 91 S. Ct. 1386; *People v. Foley* (1963), 28 Ill. 2d 426, 192 N.E.2d 850; *People v. Dominique* (1980), 86 Ill. App. 3d 794, 408 N.E.2d 280.

The defendant argues that the fact that he was found fit eight months prior to trial was not conclusive on the issue of whether a *bona fide* doubt arose as to his fitness during the trial in light of his abnormal behavior. We agree with the general proposition that a defendant's abnormal behavior should not be ignored where a prior finding of fitness was given. However, we find the defendant's case authority factually distinguishable from the case at hand. In *People v. McLain* (1967), 37 Ill. 2d 173, 226 N.E.2d 21, the defendant attempted to hang himself after the commission of the offense and was, thereafter, committed to a State hospital. When he was subsequently found fit he was brought directly from the hospital to his arraignment. The conviction was reversed because the trial court was not aware of the defendant's prior medical problems and, therefore, did not inquire into the defendant's fitness to stand trial. In *People v. Thomas* (1969), 43 Ill. 2d 328, 253 N.E.2d 431, the defendant repeatedly stated that God was his attorney and the public defender informed the court that he was unable to communicate with the defendant because of his religious hallucinations. These facts prompted the reversal of the conviction and a remand for a new trial.

The defendant asserts that his behavior at trial was sufficiently abnormal to raise a doubt of his fitness. First, he urges that the defense counsel's statement to the court that the defendant would not cooperate with him was sufficient to require the court to order a fitness hearing. The mere assertion of counsel that he has reason to believe that the defendant

is not fit is not sufficient to create a *bona fide* doubt. (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6; *People v. Dominique* (1980), 86 Ill. App. 3d 794, 408 N.E.2d 280.) A *bona fide* doubt has been found where counsel informs the court of the defendant's lack of cooperation and the defendant's behavior at trial (*e.g., People v. Thomas*) or the nature of the occurrence itself contains bizarre aspects. (*People v. Burnside* (1977), 52 Ill. App. 3d 524, 367 N.E.2d 733; *People v. Clardy* (1975), 27 Ill. App. 3d 188, 326 N.E.2d 193.) However, where a trial court believes the defendant to be fit after observing his manner and conversation throughout trial, defense counsel's statement that the defendant would not cooperate with him has not been found to raise a *bona fide* doubt of unfitness. (*People v. Foley* (1963), 28 Ill. 2d 426, 192 N.E.2d 850; *People v. Dominique.*) Moreover, the decisions in this area delineate between a situation where a defendant is fit but unwilling to cooperate with counsel and where the defendant is unfit because he is unable to cooperate with counsel. *People v. O'Neal* (1978), 62 Ill. App. 3d 146, 379 N.E.2d 12; *People v. Brooks* (1976), 40 Ill. App. 3d 996, 353 N.E.2d 326; *People v. Nicks* (1974), 23 Ill. App. 3d 435, 319 N.E.2d 531.

In the present case, the defendant sought a plea bargaining conference prior to trial and when that failed a continuance to secure new counsel. The continuance was denied. Thereafter, he refused to appear in court or cooperate with counsel until the State began its case and the trial court told the defendant his presence in court would be necessary for identification purposes. After this, the defendant voluntarily appeared and cooperated with his counsel. We do not believe that the fact that defendant retained successive defense counsel (*People v. O'Neal; People v. Brooks*), or the fact that the defendant refused to talk to his counsel or appear in court during the early phase of the trial raised a doubt of his fitness. The trial court believed that the defendant took this course of action in retaliation for its denial of his motion for a continuance to allow him to retain new counsel and could cooperate with counsel when he wanted to. (*People v. O'Neal; People v. Brooks; People v. Nicks.*) This is substantiated by the fact that up to the denial of the third continuance there was no allegation that defendant failed to cooperate with counsel. It is also argued that the defendant's behavior is not relevant because he might not have understood the proceedings or the language used by counsel and the trial court. Our reading of the record, and particularly the incident where the defendant's clothes were stolen while he was at the Cook County jail, does not support this conclusion. The trial court was best able to determine whether the defendant's behavior was so abnormal as to raise a doubt of his fitness or whether it was caused by the defendant's anger at the court because the trial court observed the de-

fendant's speech and behavior at the trial. *People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677; *People v. Dominique* (1980), 86 Ill. App. 3d 794, 408 N.E.2d 280.

Nor do we believe that the defendant's limited mental capacity, known to the trial court at the time of the trial, required the court to question the defendant's fitness. (*People v. Murphy; People v. Slaughter* (1970), 46 Ill. 2d 114, 262 N.E.2d 964; see *People v. Bilyew* (1978), 73 Ill. 2d 294, 383 N.E.2d 227.) A person may be fit to stand trial although upon other subjects his mind is deranged. *People v. Lang* (1979), 76 Ill. 2d 311, 391 N.E.2d 350; *People v. Dominique.*

The defendant in *Murphy* was an educable mentally handicapped with an IQ ranging from 37-60. The court, on review, found that though the defendant was retarded, he appeared to understand what was going on, knew what crime he was charged with, and could cooperate with his attorney. Accordingly, it affirmed the trial court's finding of fitness.

■■ We think that a review of the record supports the trial court's conclusion that the defendant, though of limited understanding, took an active role in his case when he wanted to and generally understood the proceedings. Moreover, we believe that the trial court complied with the import of the United States Supreme Court which requires consideration of the defendant's demeanor at trial, his behavior generally, and any prior medical opinion on the defendant's competence to stand trial. (*Drope v. Missouri* (1975), 420 U.S. 162, 43 L. Ed. 2d 103, 95 S. Ct. 896; *Pate v. Robinson* (1966), 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836.) Accordingly, we find no error in the trial court's refusal to order a fitness hearing.

■■ We turn next to a consideration of the section 72 petition. The defendant argues that the trial court should have granted the section 72 petition because the finding of his unfitness subsequent to his trial and sentencing raised a *bona fide* doubt of his fitness to stand trial. When facts exist which raise a *bona fide* doubt of a defendant's fitness but the trial judge was not apprised of them at trial, the appropriate remedy is a section 72 petition. (*People v. Smith* (1969), 44 Ill. 2d 82, 254 N.E.2d 492; *McDowell v. People* (1965), 33 Ill. 2d 121, 210 N.E.2d 533; *People v. Anderson* (1964), 31 Ill. 2d 262, 201 N.E.2d 394.) We note that the defendant's social history, school attendance, arrest record and commitment to the Dixon school were all known to the trial court prior to sentencing because these facts were noted in the presentence report. While it is unclear from the record how much the trial court knew of these facts prior to this report, it is clear that the court knew of the defendant's limited intelligence.

The fact that a defendant is found unfit subsequent to trial does not

give rise to a *bona fide* doubt of a defendant's fitness to stand trial. *(People v. Riley* (1980), 89 Ill. App. 3d 438, 411 N.E.2d·1039.) In *Riley* the defendant was found unfit for sentencing after an examination held within nine days of his trial. On review, the court ruled that the record on appeal did not reveal any reason why the trial court should have halted the trial to make a determination of the defendant's fitness where a pretrial fitness examination had determined him to be fit to stand trial. Moreover, it concluded that the close proximity between the trial and the psychiatric examination which found the defendant unfit did not support a conclusion that a *bona fide* doubt of his fitness to stand trial is raised. The court noted:

> "That defendant may have been suffering from a mental disturbance does not automatically raise a doubt as to his fitness to stand trial, and it is possible that such a condition could have been aggravated after trial rendering him unfit for sentencing until his condition was brought under control." 89 Ill. App. 3d 438, 442.

A review of the instant proceedings does not suggest a *bona fide* doubt of defendant's fitness to be either tried or sentenced. As the court concluded in *Riley* it is possible that the defendant's mental condition was aggravated after trial. Indeed, this conclusion is supported by Dr. Reifman's testimony that several factors, including his jail stay and his conviction, could have caused the aggravation of the defendant's condition. In finding *Riley* analogous to the instant case we note that in *Riley* the evidence gave no indication of organic brain damage while in the present case some evidence was heard on this matter. After reviewing the record, however, we find that this evidence was not conclusive. Moreover, Dr. Szyszko testified that the existence of an organic problem did not automatically render someone unfit.

The defendant also maintains that the trial court generally misunderstood and misconstrued the medical testimony of Drs. Hartman, Blumstein, and Szyszko presented at the section 72 hearing. The trial judge, in denying the section 72 petition, commented that he rejected the testimony of these medical witnesses because they equated low intelligence with unfitness. The defendant asserts that the court should have given greater credibility to these medical witnesses because each carefully explained that the basis for his belief was that the defendant functioned on such a low intellectual level that he could not comprehend generally and could not cooperate with counsel. The defendant also urges that too much weight was attached to Dr. Reifman's testimony by the court in light of the fact that he had no opinion on the defendant's fitness in November and December, 1977, during the trial.

The matter of whether a *bona fide* doubt is raised of a defendant's

fitness is an issue for the trial court. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677; *People v. Skorusa* (1973), 55 Ill. 2d 577, 304 N.E.2d 630; *People v. Dominique* (1980), 86 Ill. App. 3d 794, 408 N.E.2d 280.) Thus, where the medical witnesses are divided as to fitness, the trial court must determine the witnesses' credibility and the proper weight to be given to each witness' testimony. (*People v. Bilyew* (1978), 73 Ill. 2d 294, 383 N.E.2d 212; *People v. Tamayo* (1978), 73 Ill. 2d 304, 383 N.E.2d 227.) In *Bilyew*, the court noted that, in determining whether a *bona fide* doubt of fitness exists a trial court should analyze and evaluate the "factual bases for the experts opinions rather than relying on the ultimate opinions themselves." The court also stated that the credibility and weight to be given psychiatric testimony is a matter for the trier of fact. There the experts were evenly divided on whether the defendant was fit but all found that the defendant understood the charges and the legal process and could cooperate with counsel, although the extent of his understanding and ability to communicate was debated.

■■ In the case at bar, we do not find that the court's evaluation was erroneous. The two witnesses who examined the defendant prior to his trial, Drs. Reifman and Blumstein, both stated that the defendant appeared to understand the charge against him. Moreover, Reifman, the only medical doctor and psychiatrist to see the defendant prior to his trial, found ·the defendant's conduct at trial consistent with his finding of fitness. Reifman found that the defendant had undergone a change from his April 1977 examination to his January 1978 examination. This change resulted, according to Reifman, because of the defendant's negativism, a condition which persisted in Reifman's November 1978 examination and was confirmed by Dr. Blumstein at that time. The opinions of Drs. Hartman and Szyszko at the hearing on the section 72 petition were based solely on their March 1978 examination of the defendant and their subsequent treatment of him. While they note the probability that the defendant's condition would have rendered him unfit during the December 1977 trial, the question to be resolved here is not whether the defendant was unfit, but rather, whether there was a *bona fide* doubt raised that he was unfit. We note that even Drs. Hartman and Szyszko felt that the defendant's behavior was consistent with the conclusion that the defendant was able to understand the proceedings and anticipate some of the consequences and therefore suggested fitness. Accordingly, the trial court's ruling was not against the manifest weight of the evidence. (Compare *People v. Williams* (1980), 87 Ill. App. 3d 860, 409 N.E.2d 439.) While the trial court may have, as defendant alleges, misunderstood some of the medical testimony, we do not think, after carefully reviewing the record, that the trial court's denial of the section 72 petition was improper.

For the foregoing reasons the defendant's conviction and the order of the circuit court of Cook County denying the section 72 petition are affirmed.

Affirmed.

GOLDBERG, P. J., and O'CONNOR, J., concur.