(No. 61446.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. KEITH SHUM, Appellant.

*Opinion filed April 2, 1987.—Rehearing denied October 5, 1987.*

318

320

322

SIMON, J., and CLARK, C.J., dissenting.

Charles M. Schiedel, Deputy Defender, of Springfield (Lawrence J. Essig, Assistant Defender), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry, Thomas V. Gainer, Jr., and Sharon Johnson Coleman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RYAN delivered the opinion of the court:

The defendant, Keith Shum, was charged by indictment in the circuit court of Cook County with the murder of Gwendolyn Whipple (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)), the feticide of Whipple's unborn child (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1.1(a)(1), (a)(3)), the attempted murder of Theresa Conway (Ill. Rev. Stat. 1981, ch. 38, par. 8—4), and the rape of both Whipple and Conway (Ill. Rev. Stat. 1981, ch. 38, par. 11—1). A jury found the defendant guilty of all charges and the trial court accepted his waiver of a jury for sentencing. After hearing evidence in aggravation and mitigation, the court sentenced defendant to death on the murder charge (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(b), (d), (h)), and to concurrent prison terms for the feticide conviction, both rape convictions, and the at-

tempted murder of Conway (Ill. Rev. Stat. 1981, ch. 38, pars. 1005—8—1, 1005—8—2). The death sentence was stayed (87 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603). For the reasons set forth below, we affirm the defendant's convictions and the sentences imposed by the court.

The evidence shows that at the time of her death, Gwendolyn Whipple was nine months' pregnant. She lived with Theresa Conway and Conway's three children in a one-room apartment at 6617 Racine in Chicago. Conway was acquainted with the defendant, whom she knew only as Keith, through her boyfriend, Mark Aytchan. In fact, the defendant had visited the apartment both in the company of Aytchan and alone.

Between 11:15 and 11:30 on the evening of July 6, 1982, while Whipple and Conway were playing cards, they heard a knock at their apartment door. Both women asked who it was and the person responded "Keith." The women immediately invited the person to come in. Conway identified the man who entered the apartment that evening—the man she knew only as Keith—as the defendant, Keith Shum.

Upon entering their apartment, the defendant offered the two women some marijuana. After the three shared one "joint," the defendant remarked that Conway's boyfriend, Mark Aytchan, who was then in the Cook County jail awaiting trial on a burglary charge, had asked him to "keep an eye" on Conway and Whipple. Conway told the defendant that he was a liar because she had talked to Aytchan and that he had not mentioned any such conversation. Defendant became angry and pointed the tip of the umbrella he was carrying at Conway's left jaw until she could feel the sharp point. Conway pushed the umbrella away from her face, ran across the room, and grabbed a knife off the top of the dresser. In response,

the defendant opened his jacket and pulled out a gun. Conway told the defendant that she thought the gun was just a toy. The defendant showed Conway the bullets in the gun and she dropped the knife.

The defendant ordered the two women to lie side by side, face down, across a bed that sat next to a window in the apartment. While this was happening, one of Conway's sons was awakened by the noise. The defendant went over to the boy and placed the gun against his forehead. Conway got up and pleaded with the defendant to shoot her instead of her son. The defendant told Conway to make her son lie down and ordered her back to the bed by the window.

The defendant walked to a position behind Theresa Conway and undressed her from the waist down. He proceeded to have sexual intercourse with her while holding the gun to the back of Gwendolyn Whipple's head. Conway testified that the defendant next undressed Whipple from the waist down. She also stated that the defendant had sexual intercourse with Whipple despite her protests that he was hurting her. After he had intercourse with both women, the defendant walked around to the front of the bed. He next forced both women to perform oral sex on him by threatening to kill them if they refused.

At this point, the defendant walked to the window, opened it, and sat on the ledge. The defendant pointed the gun back and forth from left to right, aiming alternately at each of the women while telling them "I'm going to kill you." Theresa Conway testified that the next thing she heard was a bang, followed by another, and then followed by three more in rapid succession.

Conway received gunshot wounds to her right mandible, the right side of her neck, and her right arm. Whipple received a total of five gunshot wounds. One bullet entered her skull and lacerated the brain, two more

struck her on the left side of her forehead and the remaining two struck her left shoulder.

When Conway raised her head to look around the room, the defendant had gone. Conway tried to rouse Whipple but discovered that her roommate had been shot. Conway ran from the apartment down a hallway toward the apartment of Gus and Marquita Wilson.

Gus Wilson testified that it was approximately 1 a.m., July 7, 1982, when he and his wife heard a persistent knock at the door of their apartment. Wilson opened his door to find Theresa Conway "with blood all over her hands," holding her wrist. Wilson stated that Conway told him she and Whipple had both been shot. Wilson also testified that when he asked Conway who had done this to her, she replied "Keith."

Wilson immediately went to the women's apartment and found Conway's three children unharmed. He checked Gwendolyn Whipple for a pulse but was unable to detect one. Wilson returned to his apartment and called for help. A paramedic, who arrived a short time later, testified that upon his initial examination Whipple showed no vital signs and that he was unable to detect any heart tones from Whipple's unborn child. He stated that in his opinion both Whipple and the fetus were dead when he arrived.

Conway was admitted to St. Bernard's Hospital at 1:15 a.m. on July 7, 1982. At approximately 2:30 that morning she was interviewed by two detectives from the Chicago police department. Conway gave the detectives a description of her assailant. She also told them that his name was Keith and that her boyfriend, Mark Aytchan, would know more information about him, including his last name. Conway also told the detectives that they could contact Aytchan in the county jail.

The detectives interviewed Aytchan at 3:30 that morning in the county jail. Aytchan informed the detec-

tives that the only person that he could think of that Conway would be talking about was the defendant, Keith Shum. Aytchan gave the detectives the address where he knew the defendant was staying, 6418 Sangamon in Chicago.

The detectives proceeded to this address and were admitted to the defendant's apartment by his aunt, Bernice Shum. One of the detectives testified that the defendant was undressed and asleep on a couch when they arrived and that Bernice Shum woke him up to talk to them. The detective also stated that the officers identified themselves to the defendant, indicated to him why they were there, and informed him of his rights. The detective noted that when asked about the incident, the defendant denied any participation.

The defendant was taken from his apartment to St. Bernard's Hospital. There he was taken handcuffed to Conway's room. She immediately identified him as the person that had raped and shot her and Gwendolyn Whipple.

Prior to the beginning of trial, the prosecution indicated that if the defendant were found guilty, it would seek the death penalty. Moments before jury selection began the defendant tendered and filed with the court a waiver of his right to a jury during the penalty hearing. The trial judge rejected the waiver, indicating that it was his belief "that the defendant couldn't knowingly waive his right to the death penalty or the aggravation portion until *** the appropriate time, *** until he has heard all the evidence *** against him." The court began jury selection by qualifying the jurors pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770.

At trial, expert testimony revealed that Gwendolyn Whipple's death was caused by the bullet that entered her skull and that her fetus died as a result of intrauter-

ine asphyxia caused by the mother's death. Two doctors testified that Gwendolyn Whipple's full-term fetus could have survived outside its mother's womb.

The jury returned guilty verdicts on all charges. The defendant then tendered a second waiver of his right to a jury for the penalty hearing, which the court accepted. The court found that the defendant was eligible for capital punishment based on his conviction for a murder which occurred in the course of another felony "to wit, rape." Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6).

The court then heard evidence in aggravation and mitigation. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(h).) Included as evidence in aggravation was testimony by Theresa Conway and her mother as to the extent and duration of her injuries. In mitigation, defense counsel, Gwendolyn Anderson, testified as to her unsuccessful efforts to bring in witnesses to testify on the defendant's behalf and as to the unavailability of potential evidence contained in the defendant's medical and school records. Following a nearly four-week continuance to allow specific witnesses to be contacted, defense counsel again informed the court that no witnesses would be produced in mitigation. The court then found that there was "no mitigating factor sufficient to preclude the imposition of the death sentence." The court therefore sentenced the defendant to death for the murder of Gwendolyn Whipple. The court also imposed an extended prison term (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2(a)) of 60 years for the feticide of Whipple's unborn child. Prison terms of 30 years each were imposed for the rape of Gwendolyn Whipple, the rape of Theresa Conway, and the attempted murder of Conway. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1.) The prison terms are to run concurrently.

As noted above, the death sentence was stayed under the provisions of Supreme Court Rule 609(a) (87 Ill. 2d

R. 609(a)), pending the final order of this court. The cause is before us on defendant's right to direct appeal. Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603.

The defendant argues that under our recent decision in *Daley v. Hett* (1986), 113 Ill. 2d 75, the trial court erred by refusing to accept his pretrial jury waiver for the penalty phase of trial. The defendant further argues that this error allowed the court to death qualify the jury pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. The defendant maintains that his convictions should be reversed and a new trial ordered because the qualification of the jury denied him a fair trial.

Section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d)) gives the defendant convicted of a capital crime the right to have a jury decide whether the death penalty should be imposed. Also under this section of the statute the defendant may waive the right of a jury determination.

We do not agree that the defendant was denied a fair trial because of the court's failure to accept his waiver of a jury for the sentencing hearing prior to the selection of the jury at the guilt phase of the trial. The defendant executed another jury waiver following the guilt phase of the trial, and the sentencing hearing was conducted before the court without a jury. This court's opinion in *Hett*, which held that a defendant had a right to execute a jury waiver for the penalty phase of the trial prior to the commencement of the guilt phase, was filed June 30, 1986. The defendant's trial in the case now before us was commenced on September 10, 1984, and the defendant tendered a jury waiver for the sentencing hearing at the beginning of the *voir dire* examination of the jurors on that date. Thus, we must decide if *Hett* is to be applied to a case that had been commenced more than 21 months before our holding in that case.

In *People v. Erickson* (1987), 117 Ill. 2d 271, this court declined to apply *Hett* retroactively. Following the holding in *Erickson* we do not agree that the defendant was denied a fair trial either because of the trial court's failure to accept his waiver of a jury for the sentencing hearing prior to the selection of the jury at the guilt phase of the trial or because the State was allowed to question prospective jurors concerning the imposition of the death penalty pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. In *Erickson* this court stated: "It is well established that a jury questioned regarding imposition of the death penalty is presumed to be a fair jury on the issue of guilt or innocence. (*Lockhart v. McCree* (1986), 476 U.S. 162, 184, 90 L. Ed. 2d 137, 154-55, 106 S. Ct. 1758, 1770; *Wainright v. Witt* (1985), 469 U.S. 412, 419-22, 83 L. Ed. 2d 841, 849-53, 105 S. Ct. 844, 850-53.) Our cases are in accord. *People v. Free* (1983), 94 Ill. 2d 378, 401; *People v. Tiller* (1982), 94 Ill. 2d 303, 321-22; *People v. Lewis* (1981), 88 Ill. 2d 129, 147." 117 Ill. 2d 271, 292.

While cross-examining Theresa Conway, defense counsel asked whether her former boyfriend Stanley Thompson was also known as Keith Earl. Conway replied that she did not know anyone by that name. The victim was also asked about an incident in which Stanley Thompson allegedly beat both Conway and Whipple. Defense counsel then asked Conway whether she had told a private investigator that a friend whom she knew as Earl Thompson had "pimped on you and Gwendolyn Whipple?" The trial court overruled the prosecution's objection, and Conway answered no.

On redirect examination Conway was asked whether she told the investigator that there was no doubt in her mind that the defendant had shot her and Gwendolyn. Conway responded affirmatively, and the defendant offered no objection.

The defense called the private investigator as a witness, and he testified that Conway had told him that Stanley Thompson was also known as Keith Earl. On cross-examination the prosecution asked the investigator whether Conway had told him that she had made no mistakes in identifying the defendant as her attacker. The court sustained the defendant's objection and a sidebar conference was held. The court reconsidered its position and agreed that the prosecution should be allowed to bring out everything that Conway responded to in the interview. The prosecution then asked:

"MS. TRAFELET [Prosecutor]: *** [D]id not Theresa Conway indicate to you that she made no mistakes in identifying this defendant as the offender, although she did not know his last name or where he lived at the time of the incident?"

The investigator responded in the affirmative.

The defendant now argues that this testimony was introduced and used to corroborate Conway's testimony and to enhance her overall credibility. Defendant maintains that his convictions should be reversed and a new trial ordered because the admission of this testimony and the prosecution's reference to it during closing argument denied him a fair trial. We do not agree.

We note initially that the defendant's objection to Conway's direct testimony was not raised either at trial or in the post-trial motion. These objections are therefore deemed waived. *People v. Stewart* (1984), 104 Ill. 2d 463, 488.

In any event, the general rule as noted by this court in *People v. Emerson* (1983), 97 Ill. 2d 487, 501, is that "evidence of statements made prior to trial for the purpose of corroborating testimony at trial is inadmissible." Exceptions to this rule allow the admission of prior consistent statements to rebut a charge or inference that (1) the witness is motivated to testify falsely or (2) that the

in-court testimony is a recent fabrication. 97 Ill. 2d 487, 501; *People v. Powell* (1973), 53 Ill. 2d 465, 474-75; *People v. Clark* (1972), 52 Ill. 2d 374, 389.

Clearly, the inferences that the defense was trying to draw with its examination of Conway and the private investigator were that Conway had recently changed her story or that in the time between her interview with the investigator and the trial she had acquired some motive for testifying falsely. Conway's statement to the investigator that she had not made a mistake in identifying the defendant as her attacker was made prior to any alleged fabrication that occurred at trial. It also must have been made prior to her acquiring a motive to lie on the witness stand. These prior consistent statements fit neatly within the exception to the general rule noted above, and we therefore find no error in the court's admission of Conway's testimony or the cross-examination testimony of the private investigator.

Even if the defendant had not waived the issue by failing to object or raise it in his post-trial motion (see *People v. Jackson* (1981), 84 Ill. 2d 350, 358-59), we would find that the prosecution's reference to this testimony during closing argument was likewise proper. Courts of this State allow a great deal of latitude to the prosecution during closing arguments. (*People v. Dominique* (1980), 86 Ill. App. 3d 794, 806.) Statements based upon the facts in evidence are not outside the bounds of proper argument. (86 Ill. App. 3d 794, 806.) Theresa Conway's statement to the investigator had been properly admitted into evidence; the prosecution was therefore within the bounds of proper argument in alluding to it.

During direct examination, the prosecution elicited testimony from Theresa Conway, from the officer that interviewed her after the incident, from Gus Wilson, and from Mark Aytchan that Conway had said that "Keith"

had shot both her and Gwendolyn Whipple. The defendant now contends that this testimony constituted hearsay and its admission amounted to reversible error.

Conway's testimony regarding her identification of her attacker as "Keith" does not fall within the hearsay rule. (See *People v. Clark* (1972), 52 Ill. 2d 374, 389.) The fundamental basis for excluding such a statement as hearsay, the lack of an opportunity to cross-examine, is absent. (52 Ill. 2d 374, 389.) Furthermore, this court has stated that the general rule that witnesses may not testify as to statements made out of court to corroborate their testimony given at trial does not apply to statements of identification. (*People v. Rogers* (1980), 81 Ill. 2d 571, 578-79.) Conway's statement was one of identification and was properly admitted.

As to the officer's testimony, we have previously held that if a witness testifies that he previously identified an offender and the witness' veracity has been tested by cross-examination, a third person may then testify that he heard or saw the witness identify the offender because both the witness and the third person would be subject to cross-examination. (*People v. Rogers* (1980), 81 Ill. 2d 571, 579.) The evidence of the out-of-court identification by the witness and the third person should be used only in corroboration of an in-court identification and not as substantive evidence. 81 Ill. 2d 571, 579.

In this action, Conway had previously testified as to her identification of her attacker as "Keith" and as to identification of the defendant as "Keith." She was subjected to extensive cross-examination. The prosecution then asked the police officer to testify as to Conway's identification for the purpose of corroborating her original testimony. In its closing argument, the prosecution referred to the officer's testimony only to corroborate Conway's in-court identification of the defendant. This

situation clearly falls within the rules set forth in *Rogers*.

Under the law of this State, for a statement to be admitted as a spontaneous declaration, three requirements must be met. First, the occurrence must be sufficiently startling to produce a spontaneous and unreflecting statement. Second, there must be an absence of time to fabricate. Third, the statement must relate to the circumstances of the occurrence. (*People v. Robinson* (1978), 73 Ill. 2d 192, 199; *People v. Poland* (1961), 22 Ill. 2d 175, 181.) The time factor is an elusive element and will vary with the facts of the case. (*In re Hatfield* (1979), 72 Ill. App. 3d 249, 257.) The fact that the statement was made in response to the question "what happened" does not necessarily destroy its spontaneity. *People v. Damen* (1963), 28 Ill. 2d 464, 472.

Gus Wilson's testimony that Conway indicated that her attacker was "Keith" was properly admitted under the spontaneous-declaration exception to the hearsay rule. The occurrence was the rape at gunpoint and shooting of Theresa Conway and her roommate. There is no question as to whether these events were sufficiently startling as to produce an unreflecting statement. Second, the time between this particular occurrence and Conway's statement to Gus Wilson did not afford her time to fabricate. Conway's uncontradicted testimony showed that she made her statement to Wilson within minutes of realizing that the defendant had left the apartment and that she and Whipple were both injured. Lastly, the statement related to the occurrence. Gus Wilson asked Conway "who did this" and she responded spontaneously.

As to Mark Aytchan's testimony regarding Conway's identification of her attacker, we note that it was not offered to prove the truth of the matter asserted in the statement. It was offered only to establish what oc-

curred during Aytchan's interview with the police on the morning of July 7. This testimony thus falls outside the classic definition of hearsay evidence (see *People v. Rogers* (1980), 81 Ill. 2d 571, 577) and was properly admitted.

As previously noted, during direct examination Theresa Conway was also asked about the on-going nature of the injuries she sustained in the incident. The only objections to this testimony were to the form of the questions. The physician who treated Conway after the shooting testified that she had received initial treatment for a week and had been readmitted for treatment.

The defendant now contends that this testimony was irrelevant to a fair determination of his guilt and that a new trial should be ordered. We cannot agree.

"The test of the admissibility of evidence is whether it fairly tends to prove the particular offense charged, and any circumstances may be put in evidence which tend to make the proposition at issue more or less probable. [Citations.]'' (*People v. Peter* (1973), 55 Ill. 2d 443, 459.) Where a defendant is charged with attempted murder, it must be proved that he acted with the intent to kill the victim and that he took a substantial step toward the commission of the crime. (Ill. Rev. Stat. 1981, ch. 38, par. 8—4(a).) Evidence as to the extent of the injuries suffered by a victim has been held to be relevant to the defendant's intent and to the steps taken toward the commission of an attempted murder. *People v. Maxwell* (1985), 130 Ill. App. 3d 212, 218; *People v. Goodwin* (1980), 83 Ill. App. 3d 203, 206.

In the instant case the testimony regarding the nature and extent of Theresa Conway's injuries was relevant to proving both the intent of the defendant and that substantial steps were taken toward the commission of the murder.

The defendant argues that various remarks made by the trial court to the jury concerning the possible length of the trial and jury deliberations denied him a fair trial and, therefore, his convictions should be reversed.

We agree that a court's comments can have an effect on jurors (*People v. Riggins* (1956), 8 Ill. 2d 78) and that a jury should not be swayed by judicial opinion either directly or indirectly (*People v. Finn* (1959), 17 Ill. 2d 614). We also recognize that statements suggesting that a quick verdict be reached at the expense of a thoughtful verdict (*United States v. Peskin* (7th Cir. 1975), 527 F.2d 71, 85) or which reflect the judge's assessment that the facts bear relatively easy resolution are to be avoided (*United States v. Thomas* (D.C. Cir. 1971), 449 F.2d 1177, 1183), and that it is the effect of the court's statements and not the court's intent that must be examined (*People v. Kelley* (1983), 113 Ill. App. 3d 761, 767). However, a review of the record shows that defendant's contention that a reversal is required in this cause is without merit.

Instead of reversible error, we find that the trial court's statements represented an attempt to comply with the admonitions of our Rule 61(c) (87 Ill. 2d R. 61(c)). The remarks concerning the length of trial that defendant complains of were made by the judge during *voir dire*. The court's estimate of how much time the trial would entail on a daily basis and in total was given to enable the prospective jurors to ascertain whether they would be able to serve competently and continually throughout the trial. The remarks thus reflect the court's recognition of its responsibility for the "prompt and convenient dispatch of its business." (87 Ill. 2d R. 61(c)(7).) A third remark made during *voir dire* simply explained to the prospective jurors that they would be serving primarily in the afternoon. Again, the remarks were in keeping with a judge's responsibility to inform

the jurors of the scope of their duty. (See 87 Ill. 2d Rules 61(c)(5), (c)(6), (c)(7).) The final remark that defendant complains of was made close to the end of the trial and consisted of nothing more than the court's effort to inform the jurors that they might expect to be sequestered after the next session of court. Again, the remark reflects the trial judge's awareness of his responsibility for organizing his court and his consideration for the jury. 87 Ill. 2d Rules 61(c)(7), (c)(8).

The defendant also maintains that his convictions should be reversed and a new trial ordered because he was denied a fair trial by various improper arguments made by the prosecution at the guilt phase of trial.

During its closing argument, the prosecution made the following statements regarding Theresa Conway's testimony:

"MR. ADAIR [Prosecutor]: *** And Theresa told you, Gwendolyn is saying, Keith, you're hurting me. My stomach, you are pressing on my stomach."

Defense counsel immediately objected to this statement. The trial court responded by saying:

"THE COURT: *** The objection— The objection is overruled. Ladies and gentlemen, you heard what the evidence was."

The court instructed the jury that "[n]either opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded." Illinois Pattern Jury Instruction, Criminal, No. 1.03 (2d ed. 1981) (hereinafter cited as IPI Criminal 2d).

The record discloses that there was no testimony that Whipple said that the defendant was pressing on her stomach. Defendant now argues that because of this misstatement of the evidence he must be granted a new trial.

We cannot agree with the defendant's contention. Improper prosecutorial arguments "generally do not constitute reversible error unless they result in substantial prejudice to the accused. [Citations.]" *(People v. Baptist* (1979), 76 Ill. 2d 19, 29.) Considering all of the evidence presented at trial, the court's admonition to the jury following its ruling on the defendant's objection, and the court's instruction on the nature of closing arguments, we cannot say that the verdict in the action would have been different absent this single isolated remark.

Later during its closing argument the prosecution stated:

> "MS. TRAFELET [Prosecutor]: He [the defendant] wants you to believe that because there was no gun recovered, that this defendant shouldn't be found guilty. This defendant, when he left that apartment, thought that there's two dead women in that apartment. He got rid of that gun somewhere between the five blocks where he lived and where this incident took place. ***
>
> He wouldn't take that gun back home to his aunt and uncle's house. Somewhere between Sangamon and Racine Avenue— somewhere that night, he ditched that gun. Of course, the police didn't find the gun in his home."

The defendant also contends that these remarks represent a misstatement of the evidence amounting to reversible error.

We find this contention to be totally without merit. Statements of counsel and argument based upon facts and circumstances proved, or upon legitimate inference drawn from them, do not exceed the bounds of proper debate. *(People v. Burnett* (1963), 27 Ill. 2d 510, 517.) " 'It is not improper for the prosecuting attorney to reflect unfavorably on the defendant, or to comment on his actions, if based upon competent and pertinent evidence. [Citations.]' " (27 Ill. 2d 510, 517, quoting *People v. Miller* (1958), 13 Ill. 2d 84, 109.) While there was no

eyewitness testimony that this defendant concealed the gun in question, it is a legitimate inference based upon that fact that a gun was used in the assault and was not recovered. No new trial is required due to this argument.

During closing the prosecution also made several statements regarding its witnesses:

"MR. ADAIR [Prosecutor]: *** She [Theresa Conway] was telling you the truth, as best as she could. And this person that she pointed the finger at is a person that she has got no motive about, no motive to lie about, and there's no chance she could be mistaken about a person that she knew that well.

Gus Wilson is a solid guy, and he corroborates her story. Gus Wilson is such a good— was such a good witness that they didn't ask him a single question."

The defense made no objection to the remarks concerning Conway, and its prompt objection to the remarks concerning Wilson was sustained. Defendant argues that these comments constitute reversible error. Again, we cannot agree with defendant's contention.

In the first instance, the defendant failed to object to the statements regarding Conway or raise them in his post-trial motion; therefore, the issue is waived. (*People v. Jackson* (1981), 84 Ill. 2d 350, 358-59.) Any prejudice caused by the remarks concerning Gus Wilson was cured by the trial court's immediate ruling on the objection and the later instruction that the jury was to disregard statements to which objections were sustained. *People v. Baptist* (1979), 76 Ill. 2d 19, 30.

Secondly, "this court has consistently held that a prosecutor's closing argument may *** reflect upon witness credibility *** if it is based on facts in the record or inferences fairly drawn from those facts." (*People v. Bryant* (1983), 94 Ill. 2d 514, 523-24; *People v. Anderson* (1971), 48 Ill. 2d 488; *People v. Durso* (1968), 40 Ill. 2d

242.) Conway's lack of motive to lie about the identity of her attacker is an inference fairly drawn from the evidence produced concerning her relationship with the defendant.

In his closing argument, defense counsel stated:

"MR. SLAUGHTER [Defense counsel]: Now, let's talk about Mark Aytchan. Mark says that Keith told him *** you lie for me, and my mother will send you $50, and I'll go and kill your witnesses.

* * *

You determine whether or not that actually happened, and what you do is weigh Mark's statement against Mark's background.

*** Mark had been convicted so many times he forgot about some of them. *** If you get convicted, we hope that *** it means something to a person. It means that you committed a crime against your fellow citizen, and it ought to be impressed upon you that you can't go around breaking the law. Mark takes it so lightly that he doesn't even remember his convictions."

During its rebuttal the prosecution responded by stating:

"MS. TRAFELET [Prosecutor]: Why would Mark Aytchan come in here and lie? He doesn't— he has no motive to lie. He had no motive to lie to the police on the night of July 7, and he has no motive to lie here on the stand the other day when he testified. He was given no promises by the State to help him in his own case. He told the truth because he may be a burglar, but he is not a murderer and he did not want—

MS. ANDERSON: That's for the—

MS. TRAFELET: To help anybody.

THE COURT: One second. The objection is overruled."

Defendant contends that the prosecutor's remarks constituted not only the improper bolstering of Aytchan's credibility but were also a misstatement of the law as set forth in *People v. Mason* (1963), 28 Ill. 2d 396, and *Peo-*

*ple v. Kellas* (1979), 72 Ill. App. 3d 445. We do not accept either position.

As noted above, the prosecution is allowed to make comments on the credibility of the witnesses if they are based upon inferences fairly drawn from the facts. (*People v. Bryant* (1983), 94 Ill. 2d 514, 523-24.) The prosecutor had the right to draw inferences from the relationships between Aytchan and the defendant and Aytchan and the victims that he had no reason to lie to protect anyone.

As for the comment representing a misstatement of the law, we find no merit in this contention. The decisions cited by the defendant only stand for the proposition that a defendant may impeach a prosecution witness by showing interest, bias, or motive to testify falsely arising from the witness' arrest, whether or not the defendant can prove that any promises of leniency have been made. (See *People v. Mason* (1963), 28 Ill. 2d 396, 400-02; *People v. Kellas* (1979), 72 Ill. App. 3d 445, 452-54.) In its rebuttal, the prosecution was responding to a vicious attack that had been made on the witness' credibility because of his criminal record. The prosecution only stated that no promises of leniency had been made. The jury was not told that this was the only factor they were to consider in weighing Aytchan's testimony. The jury was free to consider whether Aytchan was " '*vulnerable to pressure, either real or imagined,* from the authorities.' " (Emphasis in original.) *People v. Kellas* (1979), 72 Ill. App. 3d 445, 453, quoting *People v. Baptiste* (1976), 37 Ill. App. 3d 808, 811-12.

Finally, with regard to closing argument, the defendant argues that the prosecution's entire rebuttal argument was nothing more than a collection of emotional appeals designed to arouse the passions and fears of the jury. The defendant maintains that even though objections to some of the prosecution's statements were sus-

tained, our decisions in *People v. Holman* (1984), 103 Ill. 2d 133, and *People v. Yates* (1983), 98 Ill. 2d 502, dictate that his convictions be reversed.

We disagree. The trial court sustained defendant's objection to the prosecution's reference to him as a "mutant from Hell." As noted above, the court also instructed the jury to disregard any statements to which an objection was sustained. The trial court's action was sufficient to cure any prejudice caused by this single isolated remark. (*People v. Baptist* (1979), 76 Ill. 2d 19, 30.) Other remarks of which the defendant now complains were not objected to at trial or mentioned in the posttrial motion. The alleged impropriety of these remarks has therefore been waived (*People v. Jackson* (1981), 84 Ill. 2d 350, 358-59), and plain error clearly is not applicable (see *People v. Precup* (1978), 73 Ill. 2d 7; *People v. Pickett* (1973), 54 Ill. 2d 280).

As stated previously, the courts of this State allow a great deal of latitude to the prosecution during closing arguments. (*People v. Dominique* (1980), 86 Ill. App. 3d 794, 806.) "The character and scope of argument to the jury is left very largely to the trial court, and every reasonable presumption must be indulged in that the trial judge *** properly exercised the discretion vested in him." (*People v. Smothers* (1973), 55 Ill. 2d 172, 176.) Considering the remarks of which defendant now complains, we find no abuse of discretion by the trial court in allowing the prosecution to complete its rebuttal.

At trial, Theresa Conway testified that the defendant smoked marijuana with her and Gwendolyn Whipple in their apartment on the night of the shooting. Mark Aytchan testified that the defendant told him that if he would change his testimony, the defendant would see to it that the witnesses in Aytchan's burglary case would be killed and Aytchan would receive $50 from the defendant's mother. The defendant did not object to any of this

testimony. Later, over the defendant's objection, the court gave the jury the following instruction:

> "Evidence has been received that the defendant has been involved in offenses other than that charged in the indictment. This evidence has been received solely on the issue of defendant's identification. This evidence may be considered by you only for the limited purpose for which it was received." (IPI Criminal 2d, No. 3.14.)

The defendant now contends that the evidence was totally irrelevant to the issue of identification, that the instruction was improperly given, and that his convictions must be reversed and a new trial ordered.

Defendant correctly notes that he is entitled to have his guilt or innocence determined solely with reference to the crimes with which he was charged. (*People v. Connors* (1980), 82 Ill. App. 3d 312, 319.) However, it is also well settled that evidence of other crimes is admissible for the limited purpose of proving motive, intent, identity, or common design. (*People v. Carlson* (1982), 92 Ill. 2d 440, 448; *People v. McDonald* (1975), 62 Ill. 2d 448, 455.) In fact, if it is relevant for any purpose other than to show propensity to commit a crime, evidence of other crimes is admissible. *People v. Baptist* (1979), 76 Ill. 2d 19, 27.

In this action, there was no question that Conway and Whipple were shot; the primary issue at trial was the identity of their attacker. Theresa Conway's testimony that the defendant was smoking marijuana in her apartment on the night of the shooting was clearly relevant to her subsequent identification of the defendant as her attacker. The testimony established her prior acquaintance with the defendant. Aytchan's testimony was relevant to show the defendant's consciousness of guilt. (See *People v. Gambony* (1948), 402 Ill. 74, 80.) That fact alone is sufficient to allow the admission of this testimony. (*People v. Baptist* (1979), 76 Ill. 2d 19, 27-28.)

Defendant's consciousness of his own guilt is in turn relevant to Conway's identification of him as the man who raped and then shot her.

The trial court's use of IPI Criminal 2d No. 3.14 was also proper. The jury was instructed to limit its consideration of the evidence of other crimes to a stated proper issue. If the jury found that Conway's or Aytchan's testimony was not relevant to that issue, then they were instructed that it could not be considered at all.

During its deliberations, the jury was allowed to consider several color photographs of the decedent, Gwendolyn Whipple, and her fetus. Defendant contends that the admission of these photographs denied him a fair and impartial determination of guilt or innocence. We do not agree.

It is a function of the trial court to weigh the probative value and potential prejudicial effect of the evidence. (*People v. Greer* (1980), 79 Ill. 2d 103, 117.) The decision as to which evidentiary items should be taken into the jury room rests within the discretion of the court, whose decision will not be disturbed absent a showing of prejudicial abuse. (*People v. Williams* (1983), 97 Ill. 2d 252, 292; *People v. Greer* (1980), 79 Ill. 2d 103, 117; *People v. Magby* (1967), 37 Ill. 2d 197, 202.) This court has previously held that photographic evidence having a natural tendency to establish the facts in controversy is admissible (*People v. Williams* (1983), 97 Ill. 2d 252, 290; *People v. Foster* (1979), 76 Ill. 2d 365, 375-78; *People v. Speck* (1968), 41 Ill. 2d 177, 202), and that it is not an abuse of discretion to allow the jury to consider even photographs which may be characterized as "disgusting" (*People v. Lindgren* (1980), 79 Ill. 2d 129, 143).

The photographs of Gwendolyn Whipple included a close-up which depicted five gunshot wounds to her head. The photograph illustrated the force that was used

against Whipple and clarified the technical medical testimony as to the location of her gunshot wounds. The photographs of the fetus depicted the child with the umbilical cord and placenta still attached. These corroborated the expert testimony that the fetus had developed normally and was capable of sustained life.

The cases cited by defendant do not compel a different result. In both *People v. Brisbon* (1985), 106 Ill. 2d 342, and *People v. Davis* (1983), 97 Ill. 2d 1, the photographs involved were introduced into evidence during the first phase of the sentencing hearing, not at the guilt-determination phase. The photographs were not relevant to the issue of whether the defendants were eligible to receive the death penalty. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 371-72; *People v. Davis* (1983), 97 Ill. 2d 1, 26.) In *People v. Lefler* (1967), 38 Ill. 2d 216, testimony indicated that the decedent's body showed little, if any, outward appearance of injury. The photographs involved were not probative of any fact at issue since they were taken after an internal autopsy was performed and showed the extensive incisions used in that procedure. 38 Ill. 2d 216, 221-22.

In his *pro se* brief the defendant argues that his convictions on all charges should be reversed because his arrest was carried out in violation of the fourth amendment's probable cause requirement. We note that a motion to quash the arrest was filed in this action, but that it was withdrawn prior to trial. The failure by the defendant either to bring this motion to a hearing or to obtain a ruling on it waives this issue. *People v. Lyles* (1985), 106 Ill. 2d 373, 383-87.

Furthermore, at the time of defendant's arrest, the police had talked to Theresa Conway. She provided them with a description and the first name of her attacker. She also indicated that Mark Aytchan could provide more information. Aytchan told the police that the only person

Conway could have been talking about was the defendant. This information would " 'warrant a man of reasonable caution in believing that \*\*\* the person arrested has committed the offense. [Citation.]' " (*People v. Blitz* (1977), 68 Ill. 2d 287, 292.) Therefore, probable cause existed for the defendant's arrest.

The defendant also contends in his *pro se* brief that his convictions should be reversed because Theresa Conway's out-of-court identification and his statements to police and an assistant State's Attorney were allowed into evidence in violation of his right to due process and equal protection. We do not agree.

In order to support his claim that the exclusionary rule requires that his statements and identification should have been suppressed, the defendant must show that his arrest was illegal. (See *United States v. Leon* (1984), 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405.) As stated above, the police had probable cause to arrest the defendant; thus the exclusionary rule would not apply to evidence stemming from that arrest. In addition, the record establishes that the defendant was informed of his rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, prior to making his statements to the police and the assistant State's Attorney. Furthermore, there was nothing inculpatory about the statements at issue. We therefore find that this evidence was properly admitted.

Defendant notes that there was no medical or scientific evidence presented at trial to support the allegation that Gwendolyn Whipple was raped. He also notes that there was no testimonial evidence of any observation of the alleged act, particularly the act of penetration which is necessary to support such a charge. (See Ill. Rev. Stat. 1981, ch. 38, par. 11—1(b).) As a result, defendant argues that his conviction for the rape of Gwendolyn Whipple must be reversed because the evidence was in-

sufficient to prove his guilt beyond a reasonable doubt, especially in light of his denial of guilt.

We have previously held that medical evidence is not required to prove rape. (*People v. Reese* (1973), 54 Ill. 2d 51, 58-59; *People v. Boney* (1967), 38 Ill. 2d 23, 24-25.) Therefore, a lack of such evidence in this case does not raise a reasonable doubt as to the defendant's guilt.

The evidence presented in this case was sufficient to lead the jury to the reasonable inference that the defendant did penetrate Gwendolyn Whipple. Theresa Conway testified that the defendant undressed Whipple from the waist down and that "he had sexual intercourse" with her. Her testimony as to her own rape established that she understood this to involve the act of penetration. Conway also testified that she heard Whipple say to the defendant "please, you're hurting me" while the act of sexual intercourse was proceeding. This would support the inference that defendant forcibly penetrated Gwendolyn Whipple. Finally, Conway testified that the defendant committed other identical acts on both women.

The issue of whether penetration did occur is a question of fact. (*In re Williams* (1974), 24 Ill. App. 3d 593, 598.) The lack of detail in Conway's testimony as to Whipple's rape, the fact that she may not have been in a position to see the entire act, and the defendant's denial of guilt go only to the weight of the evidence, which is to be evaluated by the jury as the trier of fact. (*People v. Lewis* (1983), 115 Ill. App. 3d 389, 397.) The jury, in carrying out this function, apparently accepted as true the inference noted above.

A finding of guilty will not be set aside "unless the evidence is so palpably contrary to the finding or so unreasonable, improbable or unsatisfactory as to cause reasonable doubt as to the guilt of the accused." (54 Ill. 2d 51, 57-58.) We cannot say that this test has been met in this case. Defendant's conviction is therefore affirmed.

Section 9—1.1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1.1) (hereinafter cited as the feticide statute) provides:

"(a) A person commits the offense of feticide who causes the death of a fetus if, in performing the acts which caused the death, he, without lawful justification:

(1) either intended to kill or do great bodily harm to the mother carrying the fetus or knew that such acts would cause death or great bodily harm to the mother; or

(2) he knew that his acts created a strong probability of death or great bodily harm to the mother; or

(3) he was attempting or committing a forcible felony against the mother other than voluntary manslaughter; and

(4) he knew, or reasonably should have known under all of the circumstances, that the mother was pregnant.

(b) For purposes of this Section, 'fetus' means a fetus which the physician or pathologist performing the fetal autopsy determines, based upon the particular facts of the case before him, to have been capable, at the time of its death, of sustained life outside of the mother's womb with or without life support equipment, and such capacity for sustained life is proven beyond a reasonable doubt." (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1.1(a), (b).

Defendant raises five questions regarding the constitutionality of the feticide statute: Does the statute (1) fail to provide an adequate definition of the stage at which culpability is triggered; (2) arbitrarily and irrationally allow unqualified physicians to conduct the fetal autopsy; (3) improperly express a policy wholly inconsistent with that of our State's abortion statute; (4) arbitrarily and irrationally distinguish between the *mens rea* requirements for feticide and murder; and (5) arbitrarily and capriciously fail to reflect the expressed intent of the legislature?

As to the first question, the defendant notes that the statute's definition of "fetus," as set forth above, is based upon shifting medical opinion as to "viability" or the point at which life can be sustained outside the mother's womb. Thus, he argues, the statute fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden. We need not address this issue since we find the defendant to be without standing to raise it.

We have stated that "[a] party who would attack a statute as unconstitutional must bring himself within the class as to whom the law is unconstitutional." (*Schiller Park Colonial Inn, Inc. v. Berz* (1976), 63 Ill. 2d 499, 510-11, quoting *People v. Bombacino* (1972), 51 Ill. 2d 17, 19-20.) In this case, there can be no shifting of medical opinion as to whether this fetus was capable of sustained life with or without special attention. This was a full-term fetus; Gwendolyn Whipple was four days past her due date and in the early stages of labor. The fetus' head was engaged in its mother's pelvis ready for delivery in a short time. The defendant is not within the class of offenders who may question the statute's definitions.

As to the second contention, the defendant again lacks standing to raise this issue. (See *Schiller Park Colonial Inn, Inc. v. Berz* (1976), 63 Ill. 2d 499, 510-11; *People v. Bombacino* (1972), 51 Ill. 2d 17, 19-20.) The fetal autopsy in this case was performed by a Cook County deputy medical examiner, a trained specialist in the field of pathology. Again, he is not within the class of defendants to whom the law is unconstitutional.

The defendant notes that in section 1 of the Illinois Abortion Law of 1975 (Ill. Rev. Stat. 1981, ch. 38, par. 81—21) the legislature declared that it was the "policy of this State to protect the right to life of the unborn child from conception." The defendant argues that the feticide statute's requirement of viability, which excludes from

prosecution persons who cause the termination of a fetus after conception, but prior to the point of viability or who cause the termination of a fetus without the requisite intent to harm the mother, cannot be reconciled with the policy expressed in the Illinois Abortion Act. Thus, defendant maintains that the feticide statute should be found unconstitutional.

Defendant's contention is without merit; these two statutes address widely different interests in what must be considered proper terms for each. In addition, the feticide statute is not inconsistent with any permissible policy of the Illinois General Assembly.

We note first that the Supreme Court has held that abortion is a constitutionally protected right. (See *Roe v. Wade* (1973), 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705.) This decision was based upon the proper balance between protecting a woman's right of privacy and enforcing the State's interest in protecting health, maintaining medical standards, and protecting potential life. (410 U.S. 113, 147-56, 35 L. Ed. 2d 147, 174-79, 93 S. Ct. 705, 724-28.) The feticide statute on the other hand, seeks to protect a pregnant mother and her unborn child from the intentional wrongdoing of a third party. In accomplishing this purpose, the legislature has chosen to punish the third party not only for any injury to the woman but also for the death of her viable fetus.

Secondly, in stating the policy noted above, the legislature was indicating its belief that a mother should not at any time have the option to voluntarily terminate her pregnancy, except when necessary to protect her life. The legislature went on to state, however, that this policy was impermissible under the Supreme Court's decisions. (Ill. Rev. Stat. 1981, ch. 38, par. 81—21.) Thus, there is no inconsistency between the two statutes.

The defendant contends that while feticide is identical in many respects to murder (compare Ill. Rev. Stat.

1981, ch. 38, par. 9—1, with Ill. Rev. Stat. 1981, ch. 38, par. 9—1.1), an arbitrary and irrational distinction exists between the *mens rea* requirements for feticide and murder. The defendant notes that, for an offender to be charged with murder, the requisite *mens rea* may be directed toward the decedent or another (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)), thus incorporating the doctrine of transferred intent. In contrast, feticide occurs only where the requisite *mens rea* is directed toward the mother and not when it is directed toward another, even the fetus. (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1.1(a)(1), (a)(2).) Defendant also points to the fact that the feticide statute excludes voluntary manslaughter and reckless conduct from its provisions. Defendant maintains that these distinctions are irrational.

We cannot agree. The exclusion of transferred-intent cases from the feticide statute was a rational decision by the legislature. An offender may be charged with feticide only where "he knew, or reasonably should have known under all of the circumstances," that his victim was pregnant. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1.1(a)(4).) In the case of an offender who intended to injure another, but instead harmed a pregnant woman, this element would be difficult, if not impossible, to establish.

In addition, restricting feticide to cases involving an intent to do great bodily harm to the mother is rational because it is highly unlikely that anyone could kill a fetus without intending to inflict serious harm on the mother. Thus, the exclusion of cases where the *mens rea* is not directed toward the mother would be a logical step for the drafters to have taken.

It is also logical to exclude cases involving voluntary manslaughter and reckless conduct because these offenses involve a less culpable mental state than that required by the feticide statute.

As to the final contention regarding the feticide statute, the defendant points to the legislative debates on the statute, and states that they suggest that its drafters intended the scope of criminality to be limited to knowing conduct. He argues that since the statute provides that culpability is found where an offender "knew or reasonably should have known" that the woman was pregnant, the statute arbitrarily and capriciously fails to express the true legislative intent.

This argument is totally without merit. In determining legislative intent, courts should consider first the statutory language. (*People v. Boykin* (1983), 94 Ill. 2d 138, 141.) If the language is clear, it is to be given effect without resorting to other aids for construction. (94 Ill. 2d 138, 141.) The language in the feticide statute is crystal clear; culpability arises whenever the defendant "knew or reasonably should have known under all the circumstances" that the woman was pregnant. We will thus give effect to this language without resort to any other aid to construction.

Defendant argues that even if the feticide statute is constitutional, his conviction must be reversed because the evidence was insufficient to prove his guilt beyond a reasonable doubt. The defendant contends that the evidence presented at trial was insufficient to establish that he knew Gwendolyn Whipple was pregnant. We cannot agree.

The record shows that Gwendolyn Whipple was nine months' pregnant on July 6, 1982. In fact, Whipple was four days past her anticipated delivery date. Medical experts testified that the fetus she was carrying was within the normal full-term weight limit. Further testimony established that the defendant had been acquainted with Whipple for four or five months prior to the incident, and a photograph showed that Whipple had not been abnormally large or obese prior to becoming

pregnant. Finally, Theresa Conway's testimony revealed that the defendant saw Whipple naked from the waist down after he undressed her on July 6, 1982.

This court has previously stated that "[c]ircumstantial evidence is the proof of facts or circumstances which gives rise to a reasonable inference of other facts which tend to establish the guilt or innocence of a defendant." (*People v. Evans* (1981), 87 Ill. 2d 77, 83.) The evidence summarized above may have been circumstantial, but "[a] conviction can be sustained upon circumstantial evidence as well as upon direct, and to prove guilt beyond a reasonable doubt does not mean that the jury must disregard the inferences that flow normally from the evidence before it. [Citation.]" (*People v. Williams* (1968), 40 Ill. 2d 522, 526.) The inference which flows normally from this evidence is that the defendant "reasonably should have known under all of the circumstances" that Gwendolyn Whipple was pregnant.

The defendant also argues that several facts in this action raised a reasonable doubt as to whether Gwendolyn Whipple's fetus was capable of "sustained life." The defendant points to three indicators that the fetus was not viable: (1) the fetus' less-than-average weight; (2) the fact that the autopsy was an external one only; (3) and Whipple's previous miscarriage. The medical testimony presented at trial, however, does not support the defendant's assertions.

The doctor who examined Gwendolyn Whipple on the morning of July 6 testified that she was in the early stages of labor and that the fetal heart tones were normal. This same doctor and the deputy medical examiner both testified that the fetus' weight, four pounds, six ounces, while below average, was within the normal full-term range. Both physicians testified that the fetus had developed with no congenital abnormalities. In fact, the deputy medical examiner limited the autopsy to an exter-

nal examination because of a total lack of abnormalities. Both physicians also testified that the condition which had caused Whipple's prior miscarriage was absent in this pregnancy. Finally, both testified that, in their opinions, Gwendolyn Whipple's fetus was capable of surviving outside its mother's womb. The defendant presented no evidence to the contrary. We find that this testimony did establish beyond a reasonable doubt that Gwendolyn Whipple's fetus was capable of "sustained life" at the time of its death.

Finally, the defendant states that his feticide conviction must be reversed because it arose from the single physical act of killing Gwendolyn Whipple. He notes that there was no evidence of any physical act or culpability directed toward the fetus. The defendant argues that under our holding in *People v. King* (1977), 66 Ill. 2d 551, a conviction may be entered only on the more serious of the two offenses, the murder of Gwendolyn Whipple. We do not agree.

In *King*, we held that convictions may not be entered on multiple offenses stemming from the same act. However, *King* is distinguishable from the facts in the case before us. The defendant in *King* was charged with rape and with burglary with intent to commit rape following his assault of a single victim. (66 Ill. 2d 551, 555.) In the instant cause of action there were two distinct victims of the defendant's single action, Gwendolyn Whipple and her unborn child. In Illinois it is well settled that separate victims require separate convictions and sentences. *People v. Butler* (1976), 64 Ill. 2d 485, 488-89.

In addition, the crime of feticide is not a lesser included offense of murder. "In order to be classified as a lesser included offense, 'all the elements of the lesser must be included within the greater.' [Citation.]" (*People v. Smith* (1980), 78 Ill. 2d 298, 306.) Under our statute, feticide constitutes any intentional serious physical at-

tack on the mother, without lawful justification, which causes the death of her fetus. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1.1(a).) Our statute defining murder does not require the death of a fetus. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1.) In fact, we have held that taking the life of a fetus is not murder under our current statute. (*People v. Greer* (1980), 79 Ill. 2d 103, 110-16.) Since there were two victims involved and feticide is not a lesser included offense of murder, both convictions may stand.

As noted above, the trial court determined that the defendant was eligible for the death penalty under section 9—1(b)(6)(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6)(c)). That section provides that a defendant found guilty of murder may receive the death sentence if "the murdered individual was killed in the course of another felony" and the other felony was either "armed robbery, robbery, *rape*, deviate sexual assault, aggravated kidnapping, forcible detention, arson, burglary, or the taking of indecent liberties with a child." (Emphasis added.) Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6)(c).

As previously discussed, the defendant now maintains that he was not proved guilty beyond a reasonable doubt of the rape of Gwendolyn Whipple. He also contends that his conviction for the rape of Theresa Conway does not make him eligible for the death sentence for the murder of Gwendolyn Whipple. Therefore, the defendant argues that even if his conviction for the murder of Gwendolyn Whipple is allowed to stand, then his death sentence must be vacated because the necessary statutory aggravating factor does not exist.

We find the defendant's contention to be totally without merit. We have already held that his conviction for the rape of Gwendolyn Whipple was supported by sufficient evidence. That conviction alone establishes his eligibility for the death sentence.

Even if we were to assume that the defendant's conviction of the rape of Gwendolyn Whipple was supported by insufficient evidence, our death penalty statute "does not require that the accused be convicted of the commission of one of the listed aggravating felonies. Whether the murder is committed in association with the actual completion of the aggravating felony or only with the attempted felony is not crucial. The aggravating factor which triggers the application of the death penalty statute is that the murder be committed *'in the course of* the aggravating felony." (Emphasis in original.) (*People v. Walker* (1982), 91 Ill. 2d 502, 510.) Therefore, a murder may be committed in the course of a rape whether or not the rape is actually consummated. The evidence in this case is sufficient to establish that this murder occurred in the course of the rape of Gwendolyn Whipple.

Furthermore, the defendant's conviction for the rape of Theresa Conway provides the necessary statutory aggravating factor for the imposition of the death penalty. The statute states:

"(b) Aggravating factors. A defendant *** who has been found guilty of murder may be sentenced to death if:

* * *

6. the murdered individual was killed *in the course of another felony* if:

* * *

(c) the other felony was one of the following: armed robbery, robbery, *rape*, deviate sexual assault, aggravated kidnapping, forcible detention, arson, burglary, or the taking of indecent liberties with a child." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6)(c).)

Hence, a plain reading of our death penalty statute reveals no requirement that the aggravating felony must have been perpetrated against the murder victim. The narrow interpretation of the statute for which the

defendant contends would prohibit the imposition of the death penalty in any situation such as was present in *People v. Ramirez* (1983), 98 Ill. 2d 439, where the murder of a bank guard was committed in the course of an armed robbery of the bank. In that case the aggravating factor, in the course of an armed robbery, was not perpetrated against the victim of the murder. Similarly in *People v. Del Vecchio* (1985), 105 Ill. 2d 414, the murder of a six-year-old boy was committed in the course of a rape and a burglary perpetrated against the boy's mother. These two cases plainly contained the statutory aggravating factor of a murder "in the course of another felony." We have stated that "[t]he apparent rationale of making the death penalty applicable to a murder during the commission of another felony [citation] is to deter further acts of violence during the commission of those felonies." (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 67.) The murder of Gwendolyn Whipple occurred in the course of the rape of Theresa Conway. To adopt the defendant's position would subvert the recognized rationale of the statute.

The defendant contends that testimony presented during the second phase of the penalty hearing concerning the grief and pain suffered by Theresa Conway, her family, and Gwendolyn Whipple's family and certain remarks made during the prosecution's closing argument in the penalty hearing denied him a fair sentencing determination. The defendant contends that as a result his death sentence must be vacated.

We note that the defendant failed to object either to the testimony or to counsel's arguments at the time they were made, and failed to raise these issues in his posttrial motion. Therefore, he has waived consideration of these issues on appeal. See *People v. Wright* (1985), 111 Ill. 2d 128, 154.

Furthermore, the admission of this testimony and the remarks made by the prosecution do not constitute plain error. It must be remembered that this sentencing hearing was conducted by the trial judge acting without a jury. In such a case, the judge is presumed to consider only competent and relevant evidence in determining sentence. (*People v. Morgan* (1986), 112 Ill. 2d 111, 144; *People v. Nuccio* (1969), 43 Ill. 2d 375, 395-96; *People v. Grodkiewicz* (1959), 16 Ill. 2d 192, 199.) This presumption also extends to the arguments and remarks of counsel. (*People v. Morgan* (1986), 112 Ill. 2d 111, 114; *People v. Grodkiewicz* (1959), 16 Ill. 2d 192, 199-200.) There are, of course, " 'limits to the immunity to improper and prejudicial insinuations which judges are presumed to possess.' " (*People v. Morgan* (1986), 112 Ill. 2d 111, 144, quoting *People v. Nuccio* (1969), 43 Ill. 2d 375, 396.) However, "[u]nless it affirmatively appears that the court was misled or improperly influenced" to the point that the resulting sentence was contrary to the law and the evidence, we will not reverse. *People v. Grodkiewicz* (1959), 16 Ill. 2d 192, 200; *People v. Morgan* (1986), 112 Ill. 2d 111, 144.

In this case, we need not discuss either the content of the testimony or the nature of the prosecutor's remarks. It appears from the trial court's comments at sentencing that these alleged improprieties had nothing to do with the court's imposition of the death penalty. We cannot say that the court was improperly influenced or misled. Therefore, we see no reason to vacate defendant's sentence based on these alleged errors.

At the second phase of defendant's death penalty hearing on October 17, 1984, the prosecution introduced five witnesses in aggravation. On November 8, the prosecution rested in aggravation and the defense called the defendant's appointed co-counsel, Gwendolyn Anderson, as a witness in mitigation. Anderson testified as to her

efforts to locate witnesses for the defendant's mitigation hearing.

According to her testimony, defense counsel made it known to the defendant's mother that she would need to appear in court on the date of the mitigation hearing. Counsel had also requested that Mrs. Shum provide the defendant's school documents. Anderson indicated that she had had no communications with the defendant's mother since October 30.

Anderson also testified that the defendant's aunt, Bernice Shum, had been contacted regarding testifying at the mitigation hearing and had been prepared to testify at the prior session of the hearing. Bernice Shum, however, did not appear on the 8th of November.

After Anderson stepped down, the court asked if the defense desired a continuance. Anderson indicated that it was her opinion that she had exhausted her efforts to obtain witnesses in mitigation. She further stated:

> "I just don't believe Mrs. Shum will be coming. *** We spent a considerable amount of time discussing with Mrs. Shum the proceedings ***. And she fully understood and appreciated the importance of her testifying. And I just don't believe that we are going to bring anybody in here to testify on his behalf."

Anderson also informed the court that Bernice Shum was unavailable to testify because her husband was in the hospital. Defendant's co-counsel, Chester Slaughter, testified that Mrs. Shum had agreed to obtain the defendant's school records but had failed to forward them.

Anderson concluded by noting, "[I]f I was a mother and I had a son in the position as Keith is in, that a lawyer would not have to call me consistently [sic] and request me to call back. *** I believe that her not returning my phone call *** indicates *** that she is not coming."

The defendant then indicated his desire to have his mother appear as a witness in mitigation. He further explained that his mother "was unhappy the way the case was being handled *** and that she didn't like the way that my attorneys has been handling the case *** and that she didn't want to be bothered ***." He did indicate that he would try and contact her. As a result, the court granted a continuance.

On the date the trial was set to reconvene, December 3, 1984, Bernice Shum was present and ready to testify. However, the trial did not commence at the set time, and she left the courthouse before trial began. The record is confusing as to whether the defendant's aunt left because of an illness in the family or because Anderson told her to.

When the penalty phase did resume on December 4, 1984, the defense again failed to produce any witnesses in mitigation. The record indicates that the relationship between the defendant and his counsel had become strained. In fact, defense counsel indicated to the court that the defendant's aunt had not been asked to return to court because the defendant had requested that she not testify. The defendant denied this allegation. Defense counsel then asked the court to rely on the presentence investigation report as evidence in mitigation, and the penalty phase proceeded to final argument and sentencing.

The defendant now argues that he was denied his sixth amendment right to effective assistance of counsel during the penalty phase of trial, and therefore his death sentence must be vacated and the cause remanded for resentencing. We cannot agree.

The test for ineffective assistance of counsel was outlined in the Supreme Court decision in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. In order to establish the ineffective assist-

ance of counsel, a defendant must show that his counsel's performance "fell below an objective standard of reasonableness" (466 U.S. 668, 688, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2065), and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068). This test was adopted by this court in *People v. Albanese* (1984), 104 Ill. 2d 504, 525-27.

As to the first element of the test, this court has held that alleged incompetency arising from a matter of trial tactics or strategy will not support a claim of ineffective representation (*People v. Haywood* (1980), 82 Ill. 2d 540, 543-44), even in a death penalty case (*People v. Madej* (1985), 106 Ill. 2d 201, 214). Furthermore, we have held that the failure to offer evidence in mitigation does not, in and of itself, demonstrate incompetence. (*People v. Lewis* (1984), 105 Ill. 2d 226, 249; *People v. Kubat* (1983), 94 Ill. 2d 437, 488.) We find therefore that the defendant has failed to demonstrate representation which falls below an objective standard of reasonableness. In fact, the defendant would not have received the potential benefits of a continuance had it not been for counsel's testimony.

As to the second element of the *Strickland* test, we cannot say that, absent counsel's conduct, there is a reasonable probability that the defendant would not have received the death penalty. The court granted the defendant a continuance to allow him to contact potential witnesses in mitigation. Still, none were produced. The court indicated that it did not rely totally on the evidence produced in mitigation, or lack of it, in reaching its sentencing decision. The judge stated: "I did not make up my mind on this case until today. I have been thinking about it constantly. *** As I sit here right now I still try to think of some mitigating factor that would

preclude the imposition of the death sentence. I cannot come up with any." Based upon the amount and nature of the evidence presented in aggravation and this statement by the court, it cannot be said that absent counsel's conduct there is a reasonable probability that a different sentence would have resulted.

Nor do we find that the cases cited by defendant dictate that this action be remanded for resentencing. The facts in these cases clearly distinguish them from the action before us. In *Douglas v. Wainwright* (11th Cir. 1983), 714 F.2d 1532, defense counsel stated in open court that he had never been involved in a proceeding where evidence in mitigation was to be produced. (714 F.2d 1532, 1556.) Counsel also informed the court that he could not bring the defendant's mother into court to testify that her son was a good boy because "he hasn't been a good boy." (714 F.2d 1532, 1555.) Counsel also stated that he "really didn't know what to do in this type of proceeding" and that he did not know what evidence in mitigation he might be able to secure. (714 F.2d 1532, 1556.) The defendant's co-counsel in the present case, Ms. Anderson and Mr. Slaughter, both had experience in this type of case. Also, they were not at a loss as to what evidence to attempt to obtain; the problem was in obtaining the evidence they wanted.

In *Dillon v. Duckworth* (7th Cir. 1984), 751 F.2d 895, the defendant was an 18-year-old with no prior criminal record, yet counsel failed to produce any evidence in mitigation. (751 F.2d 895, 901.) Counsel also had never handled a case of this nature before. (751 F.2d 895, 897.) Furthermore, defense counsel failed to pursue avenues of investigation that he knew to be open to him. (751 F.2d 895, 900.) Here, however, the defendant, Keith Shum, did not have an unblemished prior record, and again, he was represented by experienced counsel.

In *Tyler v. Kemp* (11th Cir. 1985), 755 F.2d 741, the defense attorney had only been admitted to the bar for six months before being appointed to the case. (755 F.2d 741, 746.) Again, the defendant had no prior criminal record. (755 F.2d 741, 745.) In addition, potential witnesses in mitigation testified that counsel had not explained that they were needed on an issue other than guilt or innocence. (755 F.2d 741, 744-45.) The court specifically found that evidence that might have been introduced in mitigation created a reasonable probability that a different result would have occurred. (744 F.2d 741, 746.) The record in this case, however, is uncontradicted that defense counsel did all they could to explain the nature of the proceeding to the potential witnesses.

Lastly, in *People v. Hattery* (1985), 109 Ill. 2d 449, the defendant had pleaded not guilty to the charges filed against him. (109 Ill. 2d 449, 458.) Counsel admitted in his opening statement at the guilt phase of trial that his client had committed the murder. (109 Ill. 2d 449, 458-59.) Our decision in that case was based upon defense counsel's conduct during the guilt phase, not his failure to present evidence in mitigation. 109 Ill. 2d 449, 464-65.

Nor do we find any indication of ineffective assistance by defense counsel during the prosecution's opening and closing statements during the guilt phase of trial. We have previously held that failure to make objections during opening or closing statements may represent a tactical decision which does not demonstrate actual incompetence. (See *People v. Greer* (1980), 79 Ill. 2d 103, 122; see also *People v. Murphy* (1978), 72 Ill. 2d 421.) Furthermore, any prejudice that this strategy might have caused was cured by the trial court's repeated reminders to the jury: "You are the judges of the fact, *** and you will judge what facts you heard and what facts you didn't hear, and what to make of the evidence that you did hear. *** You must determine what the facts are in this case."

Accordingly, we find that the defendant received effective assistance of counsel at all phases of his trial.

In accepting his waiver of the right to jury sentencing, the trial court did not admonish the defendant that the jury's decision to impose the death penalty had to be unanimous. We have previously held that such an admonition is not constitutionally required. (*People v. Albanese* (1984), 104 Ill. 2d 504, 536.) The defendant now asks that we reconsider our position and vacate his sentence. The defendant, however, has failed to provide any support for this request, and we therefore decline the invitation.

Defendant raises five questions regarding the constitutionality of the Illinois death penalty statute: Does the statute (1) fail to adequately narrow to a unique and cognizable group those persons eligible for the death penalty; (2) improperly place upon the defendant the burden of proving that death is an inappropriate penalty; (3) contain inadequate safeguards to prevent the arbitrary or capricious imposition of the death penalty; (4) violate the eighth and fourteenth amendments by limiting the imposition of the death penalty to those defendants who do not require special assistance to be fit for trial; and (5) improperly fail to require the sentencer to find that death is the appropriate penalty?

As to his first contention, the defendant notes that under our death penalty statute, section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1), a person convicted of murder qualifies for the death penalty if any of the statutory aggravating factors exists (see Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)). Similarly, section 5—8—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1) provides that if any of these same aggravating factors exist, any person convicted of murder qualifies for a sentence of life imprisonment. The defendant argues that our death penalty statute therefore fails to provide a meaningful distinction

between defendants eligible for the death penalty and other defendants convicted of murder.

The essence of defendant's position is that our statute is unconstitutional because a finding that a statutory aggravating factor exists does not result in a mandatory death sentence. On the contrary, such a statute has been declared to be unconstitutional by the Supreme Court. (See *Roberts v. Louisiana* (1976), 428 U.S. 325, 49 L. Ed. 2d 974, 96 S. Ct. 3001.) The court found that such a statute violated the eighth and fourteenth amendments by failing to focus on the circumstances of the particular offense and the character and propensities of the individual offender. 428 U.S. 325, 333, 49 L. Ed. 2d 974, 981, 96 S. Ct. 3001, 3006.

Furthermore, the meaningful distinction which the defendant seeks is provided by the second phase of the penalty hearing. While a defendant may either receive the death sentence or a term of life imprisonment where a statutory aggravating factor exists, he may only receive the death penalty after the sentencer considers any aggravating and mitigating factors. (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(c), (g), (h).) Only if the sentencer finds that there are no mitigating factors which preclude the imposition of the death penalty is it applied. (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(g), (h).) This procedure thus meets the requirements set forth in *Lockett v. Ohio* (1978), 438 U.S. 586, 605, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2956.

This court has previously rejected each of the defendant's remaining contentions. The defendant has either provided us with no arguments as to why we should reconsider these holdings or has cited only minority views which we have previously considered. (See *People v. Morgan* (1986), 112 Ill. 2d 111, 148.) We therefore decline the invitation to review our prior decisions.

For the reasons stated above, the judgment of the circuit court of Cook County is affirmed. The clerk of this

court is directed to enter an order setting Wednesday, September 16, 1987, as the date on which the sentence entered in the circuit court of Cook County is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of the mandate of this court shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

*Judgment affirmed.*

JUSTICE SIMON, dissenting:

Relying on *People v. Erickson* (1987), 117 Ill. 2d 271, the court holds that the rule of *Daley v. Hett* (1986), 113 Ill. 2d 75, which prohibited Witherspooning a jury in a murder case where the defendant had voluntarily waived the jury for sentencing, cannot be applied retroactively to a case pending on direct review when *Hett* was decided. The majority also follows *Erickson* in concluding that the trial court's failure to abide by the *Hett* principles did not deprive the defendant of a fair trial. As I explained in my dissenting opinion in *Erickson,* the retroactivity question is not implicated here since there has been no change in the law. And even if we do consider retroactivity, the *Hett* rule should be applied to cases, like this one, still subject to direct review. Injecting the emotional death penalty question into *voir dire* where the jurors will have no part in determining the sentence is completely unjustified and requires reversal.

CHIEF JUSTICE CLARK joins in this dissent.